WILLIAM S. BROWN et al., executors,

*v.*

HERBERT M. CONDIT et al.

[Decided September 30th, 1905.]

1. There is no presumption that because a testator makes a donation to charity having certain characteristics, he intended that in case the specified charity was impracticable or impossible, or became so after the making of his will, that the funds should be applied to such other and different charity as judicial investigation should decide most like or nearest to the charity specified.

2. Where a will exhibits an intention that a donation shall be devoted generally to charity, or to some more or less narrowly-defined charity, and prescribes a particular mode or means by which the charitable purpose shall be carried out, the failure of the specified mode or means in the lifetime of the testator will not defeat his general charitable purpose, but a court of equity will adopt a new manner or means *cy pres* to that expressed in the will.

3. Where the conditions existing at the time of a testator's death make the actual charitable purpose of a bequest impossible of accomplishment the gift lapses.

4. A testatrix bequeathed the residue of her estate, after paying her debts and certain legacies, to "the hospital fund for sick seamen at Navy Yard, Brooklyn, New York, care of W., chaplain." W. was not chaplain of the navy yard, and died before testatrix, and there was no fund for the benefit of such seamen.—*Held*, that the *cy pres* doctrine did not apply and that the bequest lapsed.

On bill, answer and proofs.

*Messrs. Blake & Howe,* for the complainants.

*Messrs. Edward A. & William T. Day,* for the defendants next of kin of testatrix.

*Messrs. Cowles & Carey* and *Mr. William D. Murray* (of the New York bar), for the defendant International Committee of Young Men's Christian Associations.

STEVENSON, V. C.

The bill is filed to obtain a construction of the will of Susan M. Corson, deceased, late of East Orange, New Jersey, who died March 11th, 1899. This will, which bears date July 7th, 1897, after making various legacies, disposes of the residuary estate as follows:

"*Fourteenth.* If after expenses and legacies are paid there be any surplus, I give, devise and bequeath it to the hospital fund for sick seamen at Navy Yard, Brooklyn, New York, care of Mr. John M. Wood, chaplain."

The heirs and next of kin of Mrs. Corson were, at the time she made her will, and at the time of her decease, the children of a deceased brother, and their claims upon her bounty are disposed of by her in a paragraph which immediately precedes the residuary clause above set forth, and is as follows:

"*Thirteenth.* As the children of my late brother will, at my death, inherit the entire estate of my late father, Calvin Condit, I feel no responsibility in regard to their future, but simply give to Herbert N. Condit, Annie E. Smith and Clarence Condit the sum of five dollars each."

Besides the next of kin, the bill brings in as defendants the International Committee of Young Men's Christian Associations, the American Seamen's Friend Society, and the United States of America. The last two named defendants have preferred no claim to the fund, and have submitted to decrees *pro confesso.*

The heirs and next of kin have answered, claiming the entire residuary estate upon the theory that the residuary devise and bequest lapsed.

The International Committee of Young Men's Christian Associations file an answer setting forth their relation to the charitable work now going on on behalf of seamen at the Brooklyn navy yard, and offering to take the fund and apply it according to Mrs. Corson's charitable purpose.

At the suggestion of the court, the attorney-general of New

Jersey has been made a party to the suit, and has had an opportunity to be heard.

The International Committee of Young Men's Christian Associations, the American Seamen's Friend Society, and the United States of America were made parties defendant by the complainants as the result of their investigation of facts and conditions at the Brooklyn navy yard, and of the charitable work which had been carried on there by Mr. John M. Wood, styled "chaplain" in the residuary clause.

Mr. Wood died on May 24th, 1898, a little less than a year after the date of the will, and a little less than a year prior to the death of the testatrix.

The testimony seems to show conclusively that neither at the time Mrs. Corson made her will nor at any time thereafter until her decease was there any "fund" in existence which could properly be called a "fund for sick seamen" at or in any way connected with the hospital of the Brooklyn navy yard. It further appears that Mr. John M. Wood was not a chaplain in any proper sense of the term. He was not an officer or employe of the United States. He was a "lay worker," a missionary, in the employ of the American Seamen's Friend Society. He did not reside at the Brooklyn navy yard, but his work seems to have been located there, and consisted principally in holding religious meetings—missionary work. He had no official employment of any kind in connection with the government hospital located at the navy yard. He merely had the privilege of ministering to the sick sailors in the hospital, presumably to such extent as his services were acceptable to them, the sailors. He also was accorded access to the navy yard and vessels stationed there for his missionary work. These privileges seem to have been accorded to other missionaries or agents of benevolent societies.

In some way Mrs. Corson became acquainted with Mr. Wood and corresponded with him, and on four occasions sent him the sum of $5 "to get delicacies for the sick boys, and flowers," &c. There is no evidence that Mrs. Corson ever had any connection whatever with any form of charitable work at the Brooklyn navy yard excepting through Mr. Wood. It might be surmised, if it

had not been proved in the case, without objection, that the form of Mrs. Corson's donation was suggested by Mr. Wood. No doubt Mr. Wood was glad to encourage Mrs. Corson and all other charitable-minded persons to put him in possession, from time to time, of moneys which he could advantageously employ for the benefit of the sick seamen among whom he worked. Without there being any element of permanency, such moneys might be regarded by Mr. Wood as his "hospital fund."

Since Mr. Wood's death in May, 1898, the American Seamen's Friend Society has, with a short intermission between the employment of two missionaries, continued the religious work which it had carried on through Mr. Wood at the Brooklyn navy yard, and when the testimony was taken in this cause was still continuing that work through the instrumentality of a missionary named Fithian.

The testimony also shows that the defendant the International Committee of Young Men's Christian Associations, in March, 1899, established a branch of charitable work among the sailors in the Brooklyn navy yard, which charitable work, although apparently wider in scope than that carried on by the American Seamen's Friend Society, seems to include the same kind of work.

My conclusion is that the charitable donation lapsed.

1. This case at the start must be sharply distinguished from that large class of cases in which the intended gift to a charitable use has gone into effect upon the death of the testator by the vesting of the gift in the donee, but the continuance of the charity has subsequently become impossible or impracticable on account of a change of conditions occurring after the death of the donor. In this last-mentioned class of cases the law to be investigated and applied relates to a possible reversion or resulting trust and to the *cy pres* power which a court of equity or the legislature may exercise. These cases, which may be divided into several sub-classes, all present a situation in which property once absolutely devoted to a public use—a charitable use—has got adrift.

The question to be considered in the case now before this court

is whether the property in litigation ever has been devoted to a charitable use; whether, when Mrs. Corson died, the charitable donation which she undertook to provide for when she made her will became effective; whether, in other words, the charitable devise and legacy vested or lapsed.

2. If it be a rule for the construction of wills that every testator who makes a donation to charity having certain characteristics is presumed to intend that in case his specified charity is impracticable or impossible, or becomes such after the making of his will or after his decease, then the fund shall be applied to that other and different charity which judicial investigation shall discover as most like or nearest to the charity specified, then the distinction above noted would seem to be unimportant. I do not think that any such rule of construction is or ever will be established in New Jersey. Whether there is any rule of positive law giving the court of chancery, independently of or subject to legislative action, the power to apply charitable funds which have got adrift—funds which are somewhat in the situation of *bona vacantia*—to charitable objects which the donor did not intend to promote, but which the court shall deem most like the object which he did intend to promote, need not be discussed in this case. See remarks of Chief-Justice Beasley, in *Hesketh* v. *Murphy, 36 N. J. Eq. (9 Stew.)* at *p. 310.*

3. While the phrase *cy pres* has been used in different meanings, sometimes causing uncertainty and confusion, it is important, I think, wherever the phrase is accurately employed, to see distinctly that the charitable operation under contemplation must of necessity be a different charitable operation from that which the donor intended. A thing which is next or nearest to another thing is plainly a different thing. *In re Prison Charities, L. R. 16 Eq. 129; Ironmongers Company* v. *Attorney-General, 10 Cl. & F. 908, 924.*

There is a large class of cases which hold that where the will exhibits an intention that the donation shall be devoted generally to charity, or to some more or less narrowly-defined charity, and prescribes a particular mode or means by which the charitable purpose shall be carried out, the failure of the specified

mode or means in the lifetime of the testator will not defeat his general charitable purpose. It is said that a court of equity will adopt a new manner or means *cy pres* to that expressed in the will. But this is not the effectuation of anything which can properly be said to be beyond the donor's intention, or which can properly be said to stand next to that intention or nearest to it, or to be most like it. Where a general direction is given that a · thing shall be done, and a particular manner is specified, and the thing directed to be done is to be done during years to come, the specification of the manner of doing the thing often is only directory, and the implication is unavoidable that the donor has intended that his purpose shall, if necessary, be effectuated in some other way than that which he has prescribed. This sort of an exercise of a so-called *cy pres* power is radically different in its nature from the substitution of an entirely different charity for one which the donor founded, but which has utterly failed. It is, in fact, carrying out the intention of the donor; not some other different, but similar intention. If a man directs by will that a hospital shall be erected, and specifies that certain materials be used or a certain architect be employed, he intends, unless he expressly states otherwise, that in case the specified materials cannot be obtained, others shall be substituted, and that in case the architect named shall be dead or unable to act, some other architect may be employed.

4. Whatever may be the rules governing charitable legacies and devises which have become operative as gifts to the public upon the death of the testator, the rule, I think, is firmly established that such legacies and devises lapse if at the time of the death of the testator it is impossible to carry the actual charitable intention of the testator into effect. It makes no difference, it seems to me, whether the impossibility existed when the will was made or arose subsequently thereto, but before the death of the testator. A court of equity will not save the gift from lapse by applying it to any different charitable object from that which the donor intended. A court of equity, under limitations which I need not discuss, will carry out the expressed general charitable purpose of the donor by the use of means other than those

specified by the donor when such specified means have become impracticable or impossible of use. But in all· such cases there is a general or comprehensive charitable purpose expressly set forth in the will or inferable from its provisions, beyond which the court will not go in its substitution of a practicable for an impracticable means. The court is acting within the donor's charitable purpose, and not beyond it or alongside of it or next to it.

In *Biscoe* v. *Jackson, 35 Ch. Div. 460 (1887)*, the court found a general charitable intention expressed in the will and applied the fund *cy pres,* according to a scheme. Lord Justice Kay says (at *p. 463*) : "I quite agree that if the mode of application is such an essential part of the gift that you cannot distinguish any general purpose of charity, but are obliged to say that that mode of doing a charitable act was the only one the testator intended or at all contemplated, and that he had no general intention of giving his money to charity, then the court cannot, if the particular mode of doing it fails, apply the money *cy pres."* The opinion proceeds to set forth that the conclusion is otherwise when the mode pointed out by the donor is not of the essence of his charitable purpose.

The same principle was expressed and applied by the supreme court of Massachusetts in the case of *Teele* v. *Bishop of Derry, 168 Mass. 341.* In this case the legacy was to trustees for the purpose of purchasing a lot and building a chapel in a town in Ireland, to be used forever for Roman Catholic worship. Such conditions were existing at and after the time of the death of the testator that it was impossible to carry out the scheme in any way, mainly on account of the refusal of· the bishop of the diocese in Ireland to give it his countenance. The court held that the *cy pres* doctrine did not apply and that the legacy lapsed. In the opinion of the court, it is stated (at *p. 343*) that "if the charitable purpose is limited to a particular object, or to a particular institution, and there is no general charitable intent, then if it becomes impossible to carry out the object, or the institution ceases to exist before the gift has taken effect, and possibly in some cases after it has taken effect, the doctrine

of *cy pres* does not apply, and in the absence of any limitation over or other provision the legacy lapses."

The general rule seems to be settled in England that a legacy to a particular institution, which is dissolved before the death of the testator, lapses, and will not be applied, either by a court of equity in the exercise of judicial power, or by the crown in the exercise of prerogative power, to the charitable objects to which the defunct institution was devoted, even though those charitable objects are distinctly defined and capable of pursuit and accomplishment. The reason given is that the charitable donor in such cases has confidence in the particular almoner whom he selects. If he designs generally to promote the charitable work, and merely names the institution as a convenient means, such intention must in some way be disclosed by the will. *In re Rymer, 1 Ch. 19 (1895)*; *Fisk* v. *Attorney-General, L. R. 4 Eq. 521 (1867)*; *In re Slevin, 2 Ch. 236 (1891)*.

The rule, I think, is applicable generally to all testamentary charitable gifts that where the conditions existing at the time of the testator's death make the actual charitable purpose of the testator impossible of accomplishment the gift lapses. *Teele* v. *Bishop of Derry, supra; In re Rymer, supra; In re White's Trusts, L. R. 33 Ch. Div. 449 (1886)*; *New* v. *Bonaker, L. R. 4 Eq. 655; 2 Perry Trusts* § 726.

No doubt it is difficult, if not impossible, to reconcile the cases to which the general principle above stated is applicable. A gift to a Bible society which ceased to exist before the death of the testator has been held in Massachusetts not to lapse, but to be a valid gift to charity, to be administered by a trustee appointed by the court. *Winslow* v. *Cummings, 57 Mass. 358 (1849)*; *Bliss* v. *American Bible Society, 84 Mass. 334 (1861)*.

The court evidently finds in these cases that the wills exhibited a charitable purpose to distribute the Bible, the particular society named as the almoner or distributer being no essential part of the testator's purpose. The same court, also, in the leading case of *Jackson* v. *Phillips, 96 Mass. 539,* found that a testamentary gift to promote the abolition of negro slavery in the United States indicated, under the circumstances proved, a

general purpose to benefit the negro race in some other way after negro slavery had been abolished.

This conclusion was reached notwithstanding the fact that the testator, Mr. Jackson, presumably desired the abolition of slavery in the United States in order to benefit not only the black race, but also the white race as well, and the further fact that a benevolent intention to liberate an individual or a race from bondage is a complete benevolent intention—embraces a complete and distinct charity—and does not imply an intention to render any further or other aid to such individual or race after the desired conditions of freedom have been established, and may even be coupled with a positive intention not to render such further or other aid. This famous case, however, is not one involving the question of lapse, inasmuch as at the time of the testator's death negro slavery was an established institution in the United States, and the gift to charity therefore went into full operation. The case, I think, would be regarded in New Jersey as presenting, upon the facts proved, the question, in a most distinct form, of the exercise of the *cy pres* power by the court of chancery as a judicial function—the application by the court of chancery of a charitable fund which, after its complete establishment, has, by the total failure of its object, got adrift—to some object absolutely distinct from any object intended by the charitable donor, but as similar as possible to such intended object. Leaving out of view the finding of the court as to the scope of the donor's charitable intention, it would seem that if negro slavery had been abolished prior to the donor's death, the charitable gift would have lapsed, under the rule stated above, and clearly laid down by the Massachusetts court in the case of *Teele* v. *Bishop of Derry, supra.*

In *Kerrigan* v. *Tabb, 39 Atl. Rep. 701 (1898)*, Vice-Chancellor Emery held that a legacy to a priest, to be used for masses for the repose of the soul of the testator, did not lapse on account of the death of the priest before the death of the testator, and that another trustee should be appointed to carry out the charitable trust. In such a case it is evident that the personal agency of the particular priest named in executing the charity is not of the essence of the testator's intention.

5. The question of fact, therefore, in this case is whether Mrs. Corson has expressed in her will any charitable purpose which does not include as an essential part the administration of the fund toward which she intended to contribute by this missionary, Mr. Wood. In endeavoring to answer this question it must be borne in mind that every gift to an individual, to be applied to a specified charitable work, or to an institution organized for the accomplishment of a specified charitable work, necessarily involves an intention on the part of the donor to promote that charitable work. And yet large numbers of benevolent persons have their charitable impulses stirred solely by their interest in the personal work of the particular missionary, the particular almoner, with whom they are brought in contact. The charitable woman who gets into correspondence with a missionary in a foreign state may make contributions in her lifetime, and give a legacy in her will to the "fund" of this missionary, with a most ardent desire to aid in the charitable work in which the missionary is engaged, and yet this same charitable woman, after the death of the missionary, may be entirely unwilling to make a gift of any kind to aid the work in which he was engaged when carried on by other persons.

Let us now consider the leading facts which indicate that Mrs. Corson had no charitable purpose relating to the sick sailors at the Brooklyn navy yard which was not essentially connected with the personal work of Mr. Wood.

Mrs. Corson lived in East Orange, New Jersey, and there is no evidence that she ever visited the Brooklyn navy yard, or that she had any connection whatever with the sick seamen at that navy yard or its hospital, excepting through Mr. Wood, whom she knew and with whom she corresponded. At least four times in her lifetime Mrs. Corson had made contributions to the sick seamen at the Brooklyn navy yard through Mr. Wood. In her lifetime, therefore, Mr. Wood apparently was an essential factor in the accomplishment of Mrs. Corson's charitable purpose on behalf of these sick seamen. There is nothing to suggest that if Mr. Wood had died after the second contribution had been made by Mrs. Corson that she would have made her third and fourth

contributions, or either of them, to Mr. Fithian, or to the International Committee of Young Men's Christian Associations.

Mrs. Corson did not intend to establish any permanent fund so as to suggest the inference that she must have contemplated the duration of her fund and its charitable application after Mr. Wood's death. There is nothing to show that Mrs. Corson contemplated that her testamentary contribution would not be promptly consumed as her former contributions had been. Although it appears that the residue of this estate is $1,944.65 —about one-fifth of the whole estate—still it is plain that the testatrix did not know that there would be any such residue, and the will shows that she thought it possible that there might not be any surplus at all. She merely gives a possible surplus—a surplus if there should be any. I think, therefore, that the magnitude of the gift must be practically excluded from consideration and that the case would be substantially the same if the legacy had been of a sum named, such as $100 or $500. The gift was plainly intended not to be kept as a fund to yield an income in perpetuity, but to be consumed presumably in a short time.

It is quite evident that there is no person or corporation engaged in charitable work at the Brooklyn navy yard whose object is to dispense flowers and other delicacies to the sick seamen in the hospital. This work is a mere incident which often accompanies ministrations by missionaries to the sick in public hospitals. The prominence of this incidental feature of religious work in a hospital must, to a large extent, depend on the personal characteristics of the missionary in each particular case. Mr. Wood was not employed by the American Seamen's Friend Society to receive and dispense alms of the kind dispensed through him by Mrs. Corson in her lifetime, and conditionally intended by her to be provided in her will. The charter of the society, in its enumeration of objects, does not seem to describe any charitable work which includes the dispensation of flowers and delicacies to sick seamen in hospitals or elsewhere. The work which Mrs. Corson aided and intended to aid by her will was not the work of the Seamen's Friend Society, but the

personal charitable work which Mr. Wood carried on of his own accord. There is no evidence that Mrs. Corson knew that Mr. Wood had any connection with the Seamen's Friend Society, or knew that that society was engaged in charitable work at the Brooklyn navy yard.

It seems to me that this charitable bequest must be construed practically in the same way as if it had been in the form of a gift to Mr. Wood, to be expended by him as an incident to his missionary work for the benefit of the sick seamen in the hospital of the Brooklyn navy yard with whom he came in personal contact. It might also, in other words, be described as a testamentary charitable effort to support Mr. Wood's personal dispensation of flowers and delicacies among the sick seamen to whom he ministered as a religious teacher. This charitable woman intended that if there should be any residue of her little estate after the payment of debts and legacies, the same should be dispensed after her death by this particular missionary, Mr. Wood—this pious, reformed drunkard whom she knew and whose personal work among the sick seamen she had repeatedly aided, but I do not think there is any evidence to justify the inference that she intended that such possible residue should be distributed by the International Committee of Young Men's Christian Associations, or by the American Seamen's Friend Society, or by such agents or missionaries, strangers to her, whom these societies or either of them might in the future see fit to employ. I do not think that Mrs. Corson contemplated any dispensation of this legacy except through the personal efforts of Mr. Wood.

It must be observed that the will does not define any mode in which the residue is to be expended for the benefit of the sick seamen. Whether the charitable object was to minister to the bodies or the souls of the sick seamen does not appear from the will. Mrs. Corson seems to have been under the mistaken opinion that a fund was in Mr. Wood's charge devoted to the procurement of certain specific benefits for these sick seamen, and that her gift—if there should be any gift—would be added to that fund. The proofs show that Mrs. Corson's four contri-

butions made in her lifetime were intended by her to provide flowers and delicacies, not tracts or testaments. In this state of affairs it would seem that if this court should undertake to effectuate Mrs. Corson's charitable donation upon the theory that her will evinces a purpose to benefit the sick seamen at the Brooklyn navy yard, apart from Mr. Wood's personal work, then it would be necessary for the decree to prescribe the manner in which the fund should be expended. In other words, a scheme would have to be formulated for administration in a foreign country. This the court of chancery will not do. *Taylor* v. *Trustees of Bryn Mawr, 34 N. J. Eq.* (*7 Stew.*) *101* (*1881*); see, also, *New* v. *Bonaker, supra.*

But apart from the difficulty of defining the object of this hospital fund and providing for its administration in a foreign state, the laws of which in regard to charitable uses have not been exhibited to the court, it is important to note that a gift designed to be expended in charity by a specified almoner indicates far more distinctly that the specified almoner is an essential part of the charitable purpose when the expenditure is to be made in a foreign land and for the promotion of a foreign charity than when such expenditure is to be made at the home of the donor for the benefit of the donor's fellow-citizens and under the control of the legislative and judicial officers of the donor's state.

It is true that in matters of construction courts lean in favor of charity. *Hesketh* v. *Murphy, supra; Hyde's Executors* v. *Hyde, 64 N. J. Eq.* (*19 Dick.*) *6, 10; Jackson* v. *Phillips, supra.*

This has been said of old. It must, however, be borne in mind that our law of charitable uses has come down to us from rude and superstitious times—from times when established charities were few. In these days almost every possible useful form of charity is established and organized and invites testamentary contributions. If an eccentric testator wants to establish some particular charity of his own he may do it in New Jersey, but there is certainly less reason now than there was formerly why courts of equity should be astute to aid the establishment of eccentric charities which donors have not clearly

intended to establish. It may be that this court must enforce a charitable bequest in perpetuity for the distribution of the Book of Mormon, or even the works of Joanna Southcote—*George* v. *Braddock, 45 N. J. Eq. (18 Stew.) 757 (1889)*—but I do not see that there is any reason for straining the law or the declared intentions of testators in order to save such charitable bequests from becoming inoperative by a lapse. Mrs. Corson, having in her lifetime made four personal gifts to Missionary Wood for use in his personal charitable work among sick seamen, made what I think was intended as a similar testamentary gift, and notwithstanding the rule of construction above referred to, I fail to see any reason why this court should infer that Mrs. Corson intended to dispense her charity through missionaries or agents of charitable associations whom she did not know.

The cases cited above indicate that the present trend is most distinctly towards maintaining the doctrine of lapse as against the exercise of a judicial *cy pres* power based upon intentions of charitable donors established by uncertain inferences which often amount to mere assumptions, if not fictions.

6. The testatrix having failed to make any disposition at the time of her death of the residue of her estate, the same will go to her next of kin. The costs of the complainants and of the answering defendants, including reasonable counsel fees, will be paid out of the fund.