THE BOARD OF TRUSTEES OF THE UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL v. THE UNKNOWN AND UNASCERTAINED HEIRS, IF ANY, OF LILLIAN HUGHES PRINCE, DECEDENT

No. 503A83

(Filed 28 August 1984)

**1. Trusts § 4.1— modification of charitable trust—prerequisites**

In order for a charitable trust to be modified pursuant to G.S. 36A-53(a), the plaintiff must show that the three following conditions exist: (1) the testatrix manifested a general charitable intent; (2) the trust has become either illegal, impossible or impracticable of fulfillment; and (3) the testatrix made no provision for alternative disposition of the trust corpus in the event the charitable trust failed.

**2. Trusts § 4.1— modification of charitable trust—general charitable intent**

The trial court properly found that testatrix manifested a general charitable intent in establishing a testamentary trust "for the purpose of erecting a building for the Carolina Playmakers" where the will contained other bequests to charities which sought to benefit the University of North Carolina, the Boston Museum School of Art and their respective students; testatrix made no provision for a gift over or reversion if the gift failed or could not be effectuated; the making of a gift for a charitable purpose which might not occur for an indefinite period of time shows the testatrix's awareness that a material change in circumstances might occur which could render impractical a literal compliance with the terms of the gift; and testatrix had a longstanding and close association with the object of her bounty, the Carolina Playmakers.

**3. Trusts § 4.2— charitable trust—impossibility of fulfillment—modification under cy pres doctrine**

A charitable trust established by a will "for the purpose of erecting a building for the Carolina Playmakers" became impracticable or impossible of

fulfillment when a dramatic arts building was constructed on the UNC-CH campus solely with funds appropriated by the General Assembly; therefore, the terms of the trust could be modified by application of the *cy pres* doctrine pursuant to G.S. 36A-53 so as to fulfill as nearly as possible the testatrix's manifested general charitable intention.

### 4. Equity § 1.1— modification of charitable trust—clean hands doctrine

The record did not disclose fraudulent acts by officials of UNC-CH in failing to disclose the availability of funds from a trust established "for the purpose of erecting a building for the Carolina Playmakers" so as to prohibit the University from seeking modification of the trust pursuant to G.S. 36A-53(a) when a dramatic arts building was constructed solely with funds appropriated by the General Assembly.

DEFENDANTS appeal as of right pursuant to N.C. Gen. Stat. § 7A-30 from the judgment of the Court of Appeals, 64 N.C. App. 61, 306 S.E. 2d 838 (1983) (*Hedrick, J.* with *Wells, J.* concurring and *Phillips, J.* dissenting) which affirmed the judgment for plaintiff entered by *Martin (John C.), Judge* in Superior Court, ORANGE County.

Plaintiff, The Board of Trustees of the University of North Carolina at Chapel Hill, brought this action for Declaratory Judgment under N.C. Gen. Stat. § 1-253, seeking the court's construction of Article IX of the Last Will and Testament of Lillian Hughes Prince. Plaintiff requested that the court exercise its statutory powers of *cy pres* over the charitable trust created by Article IX of the will. By and through their court appointed guardian ad litem, the defendants answered and counterclaimed for a declaration of resulting trust held for their benefit.

Although the testatrix, Lillian Hughes Prince, died on 25 February 1962 as a resident of the State of New York, she lived most of her adult life in Chapel Hill, North Carolina. Both she and her husband were closely involved with The Carolina Playmakers, a touring repertory company associated with the University's Dramatic Art Department. Upon her death, Mrs. Prince bequeathed in Article IX of her will her residuary estate, comprising approximately $135,000, in the following manner:

### Article IX

All of the rest, residue and remainder of my property of whatsoever kind and wheresoever located, I give and bequeath to the University of North Carolina at Chapel Hill, in

Board of Trustees of UNC-CH v. Heirs of Prince

trust nevertheless, to accumulate the income until such time as the University shall determine to use said principal and any accumulated income together with such other funds as may be available to it, for the purpose of erecting a building for the Carolina Playmakers. I ask that a suitable recognition of this gift be placed in or on the building, and it is my hope, without attaching any condition, that the building will be named the "Lillian Prince Theatre."

In 1964, officials of the University of North Carolina [hereinafter referred to as the University] requested $1,245,000 from the North Carolina General Assembly for the construction of a new theatrical facility. Thereafter, a portion of the Prince Funds was used to acquire architectural plans for a proposed theater building. In July 1971, the General Assembly appropriated $2,250,000 for the construction of a "Dramatic Arts Building," to be used for the production activities of the University's Department of Dramatic Art, which includes the Carolina Playmakers. Implementation of this project was delayed for various reasons. Eventually it became apparent to the University officials that the financing, including the addition of the Prince Funds, would be inadequate to build a facility suitable for the purposes of the University's diverse theatrical activities. As a consequence, a new design and new site had to be chosen. Finally, the University constructed a new dramatic arts facility, designated as the Paul Green Theatre, using a 1971 special appropriation by the General Assembly. The Prince Funds were not used in the construction of this theater.

The trial court concluded that the 1971 appropriation by the General Assembly constituted sufficient funding for the construction of the dramatic arts facility, thus eliminating the need for the use of the Prince Funds for that particular purpose. This sufficiency created changed circumstances which necessitated the application of the doctrine of *cy pres*, pursuant to N.C. Gen. Stat. § 36A-53, "so as to permit a modification of the terms of the decedent's bequest in order to as nearly as possible fulfill the testatrix's manifested general charitable intention."

The Court of Appeals, in upholding the trial court's judgment, found Judge Martin's findings of fact supported by the evidence and his conclusions of law properly substantiated.

*Attorney General Rufus L. Edmisten, by Assistant Attorney General George W. Boylan, for plaintiff-appellees.*

*O. Kenneth Bagwell, Jr., for defendant-appellant.*

COPELAND, Justice.

The sole issue before us is whether the charitable trust established by the will of Mrs. Prince may be modified pursuant to the *cy pres* doctrine. This principle of equity is a saving device applied to charitable trusts by the courts "to direct the application of the property to a charitable purpose as near as possible to the precise objective of the donor," when his precise intention cannot be effectuated. E. Fisch, D. Freed, and E. Schachter, Charities and Charitable Foundations § 561 (1974).

The application of the *cy pres* doctrine in North Carolina is governed by N.C. Gen. Stat. § 36A-53(a), which provides in pertinent part:

> If a trust for charity is or becomes illegal, or impossible or impracticable of fulfillment . . . and if the settlor, or testator, manifested a general intention to devote the property to charity, any judge of the superior court may . . . order an administration of the trust . . . as nearly as possible to fulfill the manifested general charitable intention of the settlor or testator. . . . This section shall not be applicable if the settlor or testator has provided, either directly or indirectly, for an alternative plan in the event the charitable trust, devise or bequest is or becomes illegal, impossible or impracticable of fulfillment. . . .

[1] Accordingly, to invoke the application of this statute the plaintiff must show that the three following conditions exist: (1) that the testatrix manifested a general charitable intent; (2) the trust has become either illegal, impossible or impracticable of fulfillment; and (3) the testatrix made no provision for alternative disposition of the trust corpus in the event the charitable trust fails. The record reveals that the third condition has been met in this case, in that the will does not provide for an alternative disposition of the trust property. Thus, we focus our inquiry on the remaining conditions to determine whether N.C. Gen. Stat. § 36A-53(a) is appropriately applied in this case.

Board of Trustees of UNC-CH v. Heirs of Prince

I.

[2] It is a well recognized principle that gifts and trusts for charities are highly favored by the courts. Thus, the donor's intentions are effectuated by the most liberal rules of construction permitted. 15 Am. Jur. 2d, *Charities*, § 126 at 147 (1964). Courts endeavor to find, when possible, a general charitable intent where the donor's specified charitable purpose is impossible to fulfill. More specifically:

> Courts have less difficulty finding a general charitable intent where the particular object fails after the charitable disposition has taken effect than when it ceased to exist before the gift took effect. In the former situation the courts infer an expectation by the donor that changing conditions resulting from the passage of time might make the effectuation of the particular purpose impossible or impracticable and that in such eventuality the donor would prefer modification of the disposition rather than reversion of the property to his heirs.

Fisch, Freed, and Schachter, *supra*, at 440. See also: *Union Methodist Episcopal Church v. Equitable Trust Co.*, 32 Del. Ch. 197, 83 A. 2d 111 (1951); *Powers v. Home for Aged Women*, 58 R.I. 323, 192 A. 770 (1937); Restatement (Second) of Trusts § 399, comment i (1957).

In considering defendants' contention that the trial court erred in finding that Mrs. Prince possessed the requisite "general charitable intent," we have carefully reviewed the facts and circumstances at bar, as well as the general legal principles applicable to the construction and interpretation of charitable trusts. We believe that the trial court's determination that the testatrix possessed a general charitable intent was proper and well supported by the evidence.

As in most situations where the settlor's intent is in question, the courts must look for evidence of that intent from the "four corners" of the instrument being construed and from the situation of the parties to the trust. *Davison v. Duke University*, 282 N.C. 676, 194 S.E. 2d 761 (1973). As the Court of Appeals pointed out, Mrs. Prince bequeathed a great portion of her estate to charity. In addition to leaving her residuary estate to the University, she bequeathed her husband's illustrations, cor-

respondence, art books, proofs, sketches and other memorabilia to the University's Art Department. She also provided for graduate scholarships at the Boston Museum School of Art for students enrolled in the Art Department at the University of North Carolina. The presence within a will of other bequests to charities, especially those of a similar character, is indicative of a general charitable intention. Fisch, Freed, and Schachter, *supra*, at 439; 15 Am. Jur. 2d, *Charities* § 163. The fact that a testator bequeathed practically all of his estate for charitable purposes is sound evidence denoting that he had a general charitable intention. *Wachovia Bank & Trust Co., N.A. v. Buchanan*, 346 F. Supp. 665 (D.D.C. 1972), *aff'd*, 487 F. 2d 1214 (D.C. Cir. 1973); *Miller v. Mercantile-Safe Deposit & Trust Co.*, 224 Md. 380, 168 A. 2d 184 (1961); *Re Stouffer's Trust*, 188 Or. 218, 215 P. 2d 374 (1950); *Christian Herald Ass'n. v. First Nat. Bank*, 40 So. 2d 563 (Fla. 1949). All of Mrs. Prince's gifts to charities sought to benefit the University of North Carolina, the Boston Museum School of Art and their respective students.

In bequeathing her residuary estate to the University, Mrs. Prince made no provision for a gift over or reversion if the gift failed or could not be effectuated. Survivorship was required, however, in her private gifts to relatives and friends. The failure, or conscious omission, to provide for the possibility of trust failure is further evidence of the testatrix's general charitable intentions. *See: In re Estate of Thompson*, 414 A. 2d 881 (Me. 1980); *Re Estate of Rood*, 41 Mich. App. 405, 200 N.W. 2d 728 (1972); *First Nat. Bank v. Elliott*, 406 Ill. 44, 92 N.E. 2d 66 (1950); Bogert, Trusts, 5th Ed., § 147.

Mrs. Prince instructed in Article IX that the University was to hold her residual estate in trust and "accumulate the income until such time as the University shall determine to use said principal and any accumulated income. . . ." for the purpose of building a theater. The making of a gift for a charitable purpose which may not occur for an indefinite period of time is a strong indication of a general charitable intent. It presupposes the settlor's awareness that a material change in the surrounding circumstances may occur which could render impractical a literal compliance with the terms of the gift. *See: Will of Porter*, 301 Pa. Super. 299, 447 A. 2d 977 (1982); *Fulton v. Trustees of Boston College*, 372 Mass. 350, 361 N.E. 2d 1297 (1977).

Board of Trustees of UNC-CH v. Heirs of Prince

Finally, we note with interest Mrs. Prince's longstanding and close association with the object of her bounty, the Carolina Playmakers, a University organization whose purpose is the production performance of dramatic art. As early as 1940, the testatrix became involved with the Carolina Playmakers. She personally appeared in a number of plays and other theatrical works produced by this company, and was given "leading roles" in at least five of the productions. Since the Carolina Playmaker's inception, it endured a lack of adequate theater facilities; a situation of which Mrs. Prince was acutely aware.

In support of their contention, defendants cite *Wilson v. First Presbyterian Church*, 284 N.C. 284, 200 S.E. 2d 769 (1973), our leading case determining the applicability of the *cy pres* doctrine. [There this Court interpreted N.C. Gen. Stat. § 36-23.2 which has since been superseded by a similar N.C. Gen. Stat. § 36A-53.] The defendants insist that the trust language and factual situations in *Wilson* and the case *sub judice* are almost identical. We believe the present case is readily distinguishable from *Wilson*.

The *Wilson* case involved a testamentary bequest by Miss Pinnix to the First Presbyterian Church in Reidsville, North Carolina "for the purpose of building a Presbyterian Church . . ., which church shall be built as a memorial to my beloved brother M. F. Pinnix, deceased." *Id.* at 287, 200 S.E. 2d at 771. In that case this Court held that the trustor had no general charitable intent to benefit the First Presbyterian Church, based on the following reasoning:

> Pertinent circumstances are: Miss Pinnix was not a Presbyterian, but a Baptist. She obviously had a deep affection for her brothers, living and deceased. She desired the construction of a lasting memorial to her deceased brother, a former sheriff of the county, from whom she inherited much of the property disposed of by her will. She was a resident of Reidsville, acquainted with the area in which she proposed that the church be built and with the inhabitants of that area and their needs.

> Nothing in the will, the pertinent portions of which are quoted above, or in any other circumstances set forth in the record, indicates that Miss Pinnix had more than a casual in-

Board of Trustees of UNC-CH v. Heirs of Prince

terest in the general religious or charitable program of First Presbyterian or of the Presbyterian denomination. Her two-fold purpose was to establish a memorial to her brother at the specified location and to promote religious activities in this part of her native city. A reasonable inference is that she believed the inhabitants of this area of the city would remember affectionately their former sheriff and, for reasons not disclosed in the record, a Presbyterian church was more likely to be constructed and to succeed therein than a church of her own denomination would be. There is nothing in the will, or elsewhere in the record, to indicate the remotest possibility that she contemplated that First Presbyterian, itself, would remove to this location and occupy the proposed building. Thus, the design of the testatrix was not to confer a benefit upon First Presbyterian, but to use the good offices of First Presbyterian in the establishment in this area of a kindred but separate church.

*Id.* at 296, 200 S.E. at 776.

Our comparison of this case and *Wilson* reveals pronounced substantive factual differences. The terms of the *Wilson* gift mandated a "memorial" to the decedent's brother, while Mrs. Prince specified no such narrow, limited intent. Although Mrs. Prince asked that her gift be appropriately recognized, she acknowledged that her wishes were clearly precatory. In *Wilson* the decedent had no "more than a casual interest in the general religious or charitable program of First Presbyterian," while for many years Mrs. Prince had been personally involved with the dramatic activities of the University. The conclusion of this Court in *Wilson* was that the testatrix did not intend to confer a benefit on the church itself. Mrs. Prince's will evinces an objective to benefit the University and those associated with its dramatic activities. Mrs. Prince did not attempt to use the University as a conduit for more paramount purposes. Instead her wishes clearly signify an intent to benefit the plaintiff. Consequently, in view of the salient distinctions which go to the underlying question of fundamental motivation, the *Wilson* case is inapposite and inappropriate.

It is our opinion that the existing evidence supports the conclusion that Mrs. Prince expressed in her will a general charitable intent to benefit the plaintiff.

Board of Trustees of UNC-CH v. Heirs of Prince

## II.

[3] We now address the remaining condition necessary to invoke the Charitable Trusts Administration Act, to wit, that the charitable trust has become illegal or impracticable or impossible of fulfillment. Many courts have applied the doctrine of *cy pres* in cases where the purpose of the trust had been already accomplished. Bogert, Trusts, 5th Ed. § 147; *Red Willow County v. Wood*, 144 Neb. 241, 13 N.W. 2d 153 (1944); *In re Neher's Estate*, 279 N.Y. 370, 18 N.E. 2d 625 (1939); *City of Newport v. Sisson*, 51 R.I. 481, 155 A. 576 (1931).

Plaintiff alleged in its complaint that:

The inadequacy of the funds committed to trust by the testatrix and the authorization by the General Assembly of North Carolina of the erection of the Paul Green Theater for use by the Department of Dramatic Art, including its 'Carolina Playmakers' and the 'Playmakers Repertory Company' constitute changed circumstances rendering the trust created under Article IX of the will of Lillian Hughes Prince impossible or impracticable of fulfillment. . . .

In denying this allegation, defendants claim that the language of the gift precludes any assertion that the gift was impossible or impracticable of fulfillment. The pertinent language directs the University to:

accumulate the income until such time as the University shall determine to use said principal and any accumulated income together with such other funds as may be available to it, for the purpose of erecting a building for the Carolina Playmakers.

The trial court, sitting without a jury, agreed with the University and made a corresponding finding of fact and conclusion of law that the trust had become impossible or impracticable of fulfillment, thus invoking N.C. Gen. Stat. § 36A-53. The Court of Appeals upheld that judgment.

Upon a review of the record, we believe that there was sufficient evidence to support the trial court's findings and conclusions. That court appropriately realized the significance of the factual circumstances and sequence of events surrounding the efforts to effectuate the trust purpose.

In 1962 the University acquired the Prince money, which amounted to approximately $132,000. With the addition of accumulated interest, the fund at the time in question totaled about $210,000. The University initiated its first official attempt to finance construction of a dramatic arts facility in 1964 by requesting $1,245,000 from the General Assembly. Funding was not available at this time. Thereafter, the University used part of the Prince Fund to acquire architectural plans for the new building. The cost of the facility was estimated at $3,000,000. On 21 July 1971, the Legislature appropriated $2,250,000 for the dramatic arts building. It appears that a series of delays, program alterations and budgetary problems hindered the implementation of this building project. In May of 1973, the University sought authorization to supplement the original legislative appropriation with money from the Prince Fund for the purpose of obtaining and installing specialized theatrical production equipment. Later that month, the North Carolina Department of Administration's Office of State Property and Construction acknowledged the Advisory Budget Commission's approval of this incorporation of the Prince Funds into the original appropriation.

Nevertheless, the combined funds still proved inadequate to construct the facility as planned. Consequently, the University had to redesign and relocate its building to reduce size and cost. Thereafter, in February 1976, the architect estimated that the new cost of building the theater would be approximately $1,364,-209, which was substantially below the original appropriation of $2,250,000. The radical changes to the project had produced an unexpected result—a surplus of funds.

Finally, using the special appropriation by the Legislature, the theatrical facilities were constructed with an excess in funding remaining. The foregoing developments lead us to believe that the University acquired this surplusage not by calculated design, but by the circumstances thrust upon it. Simply, the Prince Fund was not needed to supplement the adequate State money for the building costs. If all had gone according to the University's pre-1976 plan, the Prince money would have been incorporated into the building fund. However, unforeseen events inflicting delays, modifications and radical alterations occurred, as they are apt to do with such large construction projects. Suddenly, 12 years after its initial request for a much needed theatrical

Board of Trustees of UNC-CH v. Heirs of Prince

facility, the University found itself in the unexpected position of holding excess State funding.

Perhaps the University should have offered to return to the General Assembly an amount of state funding equivalent to the Prince money, as the defendants contend, or at least made sure that the Legislature was informed of the availability of the Prince Fund. Although, with regard to requests for appropriations to our General Assembly, we advocate financial disclosure by those groups seeking state assistance, we do not construe, in this instance, the University's failure to use the Prince Funds in the construction project as a fraudulent act.

[4] Defendants argue that the relief sought by the University is barred by the general equitable doctrine "that he who comes into equity must come with clean hands." The record does not support the accusation of fraudulent acts indicating a manifest abuse of fiduciary responsibility by the University.

Defendants predicate their claim of "unclean hands" mainly on a memorandum from the University's director of operations and engineering to two University officials. This document, whose purpose was to arrive at a "probable budget," discussed the unresolved construction details, the names of the low bid contractors and their respective cost estimates, and the recommendations of the architect. The memorandum also includes the director's comments that:

> If State makes us put our $210,000 (Prince Funds) into the project the the (sic) State could retract an additional $210,000. . . . I suggest no one publicize this budget.

Defendant reasoned that the University officials' action in not disclosing the availability of the Prince Funds in this "proposed budget" constituted sharp practice. We disagree. The document was not a "proposed budget" that the University intended to present or ever in fact presented to the State; rather, it was an analysis by a University employee of the possible expenses which might be incurred. The construction contracts involved were still at the tentative stage, thus any publication of this probable budget would be premature. The record was devoid of any evidence that this document was or was not in fact publicized by University officials.

Indeed, the record indicates that the plaintiff was well aware of its responsibilities imposed by the Prince bequest. The University expressly acknowledged in its May 1973 request to the Office of State Property and Construction that:

As you are aware, the University has a special Trust Fund (The "Prince Fund") which was given to the University for the specific use in a theater for dramatic arts. The restrictions of this gift fund are such that we cannot use these funds elsewhere; . . .

This letter to the Office of State Property and Construction reflects the positive actions by the plaintiff, consistent with the wishes of Mrs. Prince, to obtain the proper authorization to add the trust funds to the legislative appropriation. In further keeping with the testatrix's objective, the University used part of the Prince money to acquire the design of the theater facility. We do not find these actions consistent with the defendants' claim of deliberate efforts of concealment.

We hold that the construction of the new dramatic arts facility, made possible by the legislative grant of sufficient funds, expressly made "impracticable" the achievement of Mrs. Prince's trust. Her primary objective has been fulfilled. Consequently, in consideration of the evidence before us, we conclude that the trial court did not err in ruling that this charitable trust had become "impossible or impracticable of fulfillment" within the meaning of N.C. Gen. Stat. § 36A-53.

### III.

Application of the *cy pres* doctrine mandated by the Charitable Trusts Administration Act reflects this State's "strong policy" that courts shall modify the terms of a trust instrument "in order to preserve the trust." *Edmisten v. Sands*, 307 N.C. 670, 675 n. 1, 300 S.E. 2d 387, 391 (1983). In accord with our above holdings that competent evidence supports the trial court's findings of fact that the decedent possessed a general charitable intent and that the trust had become impossible or impracticable of fulfillment, we conclude that the plaintiff is entitled to reformation of the charitable trust established under Article IX of the Will of Mrs. Prince. We further approve of the trust amendment ordered by the trial court which provides for the distribution of

income for "activities that enhance the production, development, maintenance, and student participation in theatrical productions sponsored by the Department of Dramatic Art," with appropriate recognition given to Mrs. Prince's generosity.

The judgment of the Court of Appeals is hereby affirmed.

Affirmed.