# IN THE SUPREME COURT OF IOWA

No. 63 / 06-0067

Filed July 27, 2007

**NORMAN J. KOLB, Trustee of the
Robert James Kolb Memorial Trust**,

Appellee,

vs.

**CITY OF STORM LAKE, IOWA**,

Appellant.

Appeal from the Iowa District Court for Buena Vista County, Richard J. Vipond, Judge.

City appeals district court decision that charitable trust failed and could not be modified under cy pres. **REVERSED AND REMANDED.**

Ivan T. Webber of Ahlers & Cooney, P.C., Des Moines, for appellant.

Mark McCormick of Belin Lamson McCormick Zumbach Flynn, P.C., Des Moines, for appellee.

**CADY, Justice.**

In this case a charitable trust was established by an altruistic and benevolent family to maintain a flower garden at a designated location in a city park for the enjoyment of the public in the memory of a family member whose young life was tragically cut short. We must decide whether the trust may be modified under Iowa Code section 633A.5102 (2007) to permit expenditures by the trust to maintain the garden at a different location in the park, after the city removed the garden to make room for a major economic development project. The district court refused to modify the trust. We believe section 633A.5102 applies, and we modify the trust as requested. We conclude the settlors' general charitable intentions were to memorialize a family member by maintaining a flower garden for the enjoyment of the public, and this charitable purpose is superior to the specific language of the trust regarding where the funds were to be spent. In addition, because changed circumstances have made it impracticable, if not impossible, to ever carry out the trust at its original designated location, we conclude the trust may be modified to fund the garden at its new location. The evidence and arguments against the continuation of the trust are moving and substantial, but, in the end, we think it is clear the settlors would have wanted the trust to continue, and such a result is consistent and appropriate under Iowa law. We reverse the decision of the district court and remand for further proceedings.

## I. Background Facts and Proceedings.

Almost a century ago Henry and Martha Kolb started a family owned floral business in Storm Lake, Iowa. Over time, the business became a fixture in town, as did the Kolb family. Both grew into

prominence, and enjoyed much success. Tragedy, however, gripped the family when the Kolb's grandson, Robert, died in a hunting accident. This gut-wrenching event led to the creation of a trust, which is the centerpiece of this litigation.

In 1968 Henry established an agreement with the city of Storm Lake (City) to establish a flower garden in memory of Robert. The agreement provided for the "establishment, installation and maintenance of a formal flower garden" at a specific location within the City park on the north shore of Storm Lake. The agreement made it clear the garden was a gift to the City, and that the agreement was to "continue during the period of the trust as created in [Henry's] Will . . . providing for the continued maintenance of said formal flower garden."

In 1969 Henry and Martha were "desirous of supplementing" their previous gift by establishing a "water fountain on the park area immediately adjacent and West of the land specifically described in [their previous] agreement." As a result, the Kolbs entered into an agreement with the City in which the City granted the Kolbs permission to install the water fountain next to the garden. This agreement acknowledged the parties' previous agreement, but did not reference any testamentary trust or period of time the agreement was to last.[1]

The Robert James Kolb Memorial Trust Fund was finally established in 1970. Henry and Martha established the trust by deeding a quarter section of farmland they owned to their sons "Robert H. Kolb and Norman J. Kolb, as Trustees for the use and benefit of the City of Storm Lake." The warranty deed stated in pertinent part:

---

[1]There was, however, a supplemental agreement made between the City and the Kolbs in 1972 that recognized the Kolbs had completed the construction of the fountain and the City would assume all liability and maintenance of the fountain thereafter.

It is the purpose of the grantors to hereby establish the Robert James Kolb Memorial Trust Fund out of the real estate above described and the proceeds derived from the sale thereof and/or the income derived therefrom, or any investments created by said trust fund. . . .

. . . .

The said trust fund shall be used in connection with improvements needed for the planting and upkeep of flower beds, such as annuals and perennials of all kinds, also flowering bulbs and rose bushes as may be put upon the tract of real estate hereinafter described, as follows:

[legal description of the location of the garden that was included in the previous agreements]

The Trustees are further authorized to use said trust fund for the paying of a park custodian to maintain said flower beds on the park area herein referred to. The Trustees are given full power to collect the rents, issues and profits from the above described tract of real estate, pay the necessary costs of operation thereof and the net income derived therefrom shall be used for the purposes herein set out. In event the Trustees determine there is any surplus in the funds to be currently used for the improvement and maintenance of the park area they may invest the funds in Government Bonds and use the principal and income for the maintenance of the park area herein described. If in the future there are enough funds available to handle a larger flower garden, then the Trustees are to ask permission from the Park Board for an extension of the present plot to the East side.

. . . .

The Trustees are further authorized to borrow money, which may later be repaid out of the income or principal of the trust fund, and with borrowed money, or with the proceeds from income or principal from the trust fund, the Trustees are authorized to construct a water fountain upon park property owned by the City of Storm Lake, adjacent to the tract of real estate herein described as flower beds.

The warranty deed also named the Security Trust & Savings Bank of Storm Lake as the successor trustee.

Three years later, in 1973, Henry and Martha deeded another quarter section of their farmland to their sons, Robert and Norman, as

trustees, "for the use and benefit of the City of Storm Lake." This warranty deed stated "that this shall become a part of the Robert James Kolb Memorial Trust Fund established by the grantors in the year 1970, in order that this trust and the previously established trust may be handled as a single trust." The language in the 1973 warranty deed was very similar to the previous deed (it contained all but the first and last paragraphs in what is quoted above), but it also stated "[t]he Trustees are fully authorized to cooperate with the Park Board of the City of Storm Lake, Iowa, in carrying out the provisions of this trust." Neither warranty deed stated when the trust terminated.

The trust operated without much trouble or question for over thirty years under the direction of Robert and Norman as trustees.[2] Norman usually filed the trust's annual reports. The reports indicated the income produced from the trust res, or farmland, was more than enough to pay for the trust expenses. The trust disbursements mainly consisted of farm, garden and fountain expenses, which often equaled twenty to thirty thousand dollars. A significant portion of these expenses, sometimes ten to twenty thousand dollars, included managerial fees to the trustees for administering the trust. Despite such expenses, over the years the trust accumulated surpluses that were usually invested in CDs or placed in checking accounts.

On one occasion, however, the trustees used surplus trust funds to help the Storm Lake School District purchase additional school property. This transaction was memorialized in a 1980 agreement between Norman and the school district. The agreement specifically

---

[2]Robert died in 2002, and thereafter Norman acted as sole trustee until his own death just recently in July 2007.

acknowledged the trust was "designated to provide for the establishment of flower gardens, park improvements, planting of shrubberies, trees and flower gardens upon publicly owned properties in Storm Lake." Pursuant to the agreement, the trustees paid $34,605 out of trust funds towards the purchase price of the property.[3]

Henry died testate[4] in 1978 and his wife, Martha, died a short time later. Despite their deaths, the garden and fountain survived for many years with the help of the City's maintenance and funds provided by the trust. It was a cherished location in Storm Lake, and often provided an ideal spot for weddings and celebrations.

In 2003, however, the existence of the garden and fountain was placed in jeopardy. At this time the City was developing plans for an economic revitalization project called "Project Awaysis," funded with Vision Iowa grant money. *See* Project Awaysis, http://www.awaysis.com (last visited July 24, 2007). The plans sought to turn the City's park on the north shore of Storm Lake and surrounding areas into a Midwest vacation destination. Among other things, the project was to provide a new public beach, a lighthouse, a family playground, a lodge, and an indoor/outdoor water park. Most importantly, the plans called for relocating the memorial gardens and fountain within the City's park. The project was viewed by its planners, and others, as a vital and necessary move for the City to grow and compete for jobs and residents in the future.

---

[3]The record clearly shows the trust paid $34,605 in 1981 to help the school purchase the land. Curiously, however, this disbursement does not appear to be indicated in the trust's annual reports.

[4]Henry's will, however, did not mention any kind of trust. Therefore, there was no testamentary trust as referred to in the 1968 agreement between Henry and the City.

When Norman heard about the project he approached the City with a plan to modify the trust. The plan was contained in a "Petition to Modify." The petition stated Norman and the City had "entered into meaningful discussion relative to the modification of said trust with the purpose in mind of moving the water fountain and flower garden and to alter the financing of said trust." It also stated "[t]he trustee believes it would be in the best interest of the beneficiary if the Water Fountain and Flower Garden could be moved from its present location to a new location within the proposed Lakeside development." Finally, the petition listed several terms and conditions the parties would agree to. These terms included the condition that the garden and fountain "be of the same design and size as it now is," and that the City convey the better farm to Norman and his family. This petition, however, was never signed or implemented.

Instead, Norman and his attorney met with the City's attorney and the project director for Project Awaysis. At the meeting, and in a follow-up letter dated June 6, 2005, Norman expressed his position that "the garden and fountain cannot be moved, or reconfigured in any way." The City responded it could not change the plans for Project Awaysis, and the garden and fountain would be removed in the fall of 2005.

In order to prevent the removal of the garden and fountain, Norman filed a petition against the City. The petition requested the court to issue a temporary and permanent injunction, or, in the alternative, a declaratory judgment that a resulting trust had been created because the original trust had failed. The City eventually filed an amended answer and counterclaim and requested the court to supervise the trust and remove Norman as trustee. It also requested an accounting to justify the

managerial fees, and requested Norman reimburse the trust for any excess fees or losses incurred under his supervision. Finally, it alleged the cy pres doctrine precluded declaration of a resulting trust.

Both parties filed motions for summary judgment. On September 6, 2005, the court held a hearing to rule on these motions and Norman's request for a temporary injunction. The court denied the temporary injunction the same day. Thereafter, the City began to remove the garden and fountain. The court later denied both parties' motions for summary judgment because a genuine issue of material fact existed as to the purpose of the trust. The matter was then tried before the court in October of 2005.

The court entered a decree finding "the purpose of the trust is to provide funds for the maintenance of a flower garden and fountain on a specific plot of ground." It noted the decisive issue was whether the cy pres doctrine applied, and answered that question in the negative "because the purpose of the trust has not become impracticable, unlawful or impossible to fulfill." It based its decision on the fact the City voluntarily destroyed the fountain, and without such destruction "it was possible for [the garden and fountain] to continue in existence for an indefinite time in the future." As a result, the court entered an order finding the trust's purpose had been destroyed and that it therefore became a resulting trust to benefit the settlors' successors. The court also dismissed the City's counterclaim with prejudice. The City appealed.

**II. Issue and Standard of Review.**

We have one issue to decide. The question presented is whether the cy pres doctrine applies to allow the modification the City requests.

Never before have we specifically stated our standard of review in deciding such questions.[5] *See, e.g., In re Trust of Rothrock*, 452 N.W.2d 403 (Iowa 1990) (deciding whether the cy pres doctrine should apply when the trial court determined it did); *Simmons v. Parsons Coll.*, 256 N.W.2d 225 (Iowa 1977) (deciding whether the cy pres doctrine should apply when the trial court determined it did not). Other jurisdictions have indicated an appellate court should review a trial court's modification under cy pres for an abuse of discretion. *See Burr v. Brooks*, 393 N.E.2d 1091, 1097–98 (Ill. App. Ct. 1979) ("A trial court is allowed considerable discretion in making a Cy pres application and a reviewing court will step in only if the discretion is abused."); *Sherman v. Richmond Hose Co. No. 2*, 130 N.E. 613, 616 (N.Y. 1921) ("The exercise of the cy pres doctrine always involves a large measure of discretion. Nothing in the record before us shows the improper exercise of that discretion."). At least one court has indicated the review should be de novo when reviewing a trial court's decision to apply cy pres or not. *See In re R.B. Plummer Mem'l Loan Fund Trust*, 661 N.W.2d 307, 311 (Neb. 2003) ("The doctrines of cy pres and deviation are equitable doctrines used to adjust the manner in which a trust is administrated. Accordingly, we determine that when the issue is whether a trial court

---

[5]The appellees rely to a certain extent on contract law, and that is not surprising given the close relation between facts that typically surround questions of cy pres and our prior case law dealing with the subject. *See Lupton v. Leander Clark Coll.*, 194 Iowa 1008, 1021, 187 N.W. 496, 502 (1922) (Faville, J., dissenting) ("I do not think the cy pres doctrine has any application whatever to the facts in this case. As I view it, Leander Clark entered into a valid, binding, and enforceable contract with the college, based upon an adequate and sufficient consideration."); *Curtis & Barker v. Cent. Univ. of Iowa*, 188 Iowa 300, 313, 176 N.W. 330, 335 (1920) ("We consider these [contractual issues] the more important questions in this case."). The agreements in this case, however, both specifically describe the garden and fountain as charitable gifts to the City, and they also reference such gifts as dependent on a trust to be established. As a result, we think the law of charitable trusts governs the outcome in this case.

should apply cy pres or deviation, we review the issue de novo on the record.").

We believe, and the parties agree, our standard of review in this case is de novo. An abuse of discretion standard may be proper when the question is whether the court's modification under cy pres is appropriate. However, when the question is whether the cy pres doctrine applies we are convinced the standard of review is de novo. *See* Iowa R. App. P. 6.4 (stating cases heard in equity are reviewed de novo). Thus, we are not bound by the trial court's findings of fact, but give them weight in our decision because of the trial court's opportunity to view the evidence and witnesses firsthand. *Mahaffey v. Civil Serv. Comm'n*, 350 N.W.2d 184, 185 (Iowa 1984).

### III. The Cy Pres Doctrine in Iowa.

In French "cy pres" means "as near as," and is usually pronounced "see pray." Black's Law Dictionary 415 (8th ed. 2004); *see* Ronald Chester, George Gleason Bogert & George Taylor Bogert, *The Law of Trusts & Trustees* § 431, at 113–14 (3d ed. 2005) (noting the French pronunciation is "see pray," and that if Anglicized, it would be pronounced as if spelled "si press," but that common usage mistakenly mixes the two so as to be pronounced as if spelled "si pray") [hereinafter Bogert, *Trusts & Trustees*]. It is derived from the French Norman expression "cy pres comme possible," which means "as near as possible." *See In re Gerber*, 652 P.2d 937, 939 n.4 (Utah 1982); *see also Rothrock*, 452 N.W.2d at 406. Cy pres is a common law doctrine that "permits a court to change the purpose or recipients of a charitable trust under certain circumstances." Martin D. Begleiter, *In the Code We Trust—Some Trust Law for Iowa at Last,* 49 Drake L. Rev. 165, 290 (Iowa 2001)

[hereinafter Begleiter, *Code We Trust*]; *see* Black's Law Dictionary 415 (defining cy pres as an "equitable doctrine under which a court reforms a written instrument with a gift to charity as closely to the donor's intention as possible, so that the gift does not fail"). When the doctrine applies, however, the change must be "cy pres comme possible," or as near as may be, to the settlor's original intention. *See Late Corp. of the Church of Jesus Christ of Latter-Day Saints v. United States*, 136 U.S. 1, 56, 10 S. Ct. 792, 807, 34 L. Ed. 478, 495 (1890) (recognizing the common law doctrine of cy pres, and stating its use is to fulfill the charitable purpose "as near as may be, to the original intention of the donor").

The cy pres doctrine was not immediately recognized in Iowa. *See Filkins v. Severin*, 127 Iowa 738, 738, 104 N.W. 346, 346 (1905) ("[T]he cy pres doctrine is not recognized in this state . . . ."); *Lupton v. Leander Clark Coll.*, 194 Iowa 1008, 1023, 187 N.W. 496, 502 (1922) (Faville, J., dissenting) ("I do not care to enter into the discussion of the interesting question as to how far we have recognized the application of the cy pres doctrine in this state."); *see also* Bogert, *Trusts & Trustees* § 433, at 148–49 (explaining why American courts were reluctant to recognize cy pres). Now the doctrine is not only widely accepted by our courts, *see, e.g.*, *Rothrock*, 452 N.W.2d at 406 (holding the trial court properly applied the common law doctrine of cy pres), but our legislature has codified the doctrine into law, *see* 1999 Iowa Acts ch. 125, § 86 (codified at Iowa Code § 633.5102 (2001), and creating a new section entitled "Application of cy-pres"); Begleiter, *Code We Trust*, 49 Drake L. Rev. at 290 (recognizing newly enacted Iowa Code section 633.5102 (2001) codified the common law doctrine of cy pres).

As a result, whether the cy pres doctrine applies in this case is dependent upon our construction and analysis of section 633A.5102.[6] Section 633A.5102 states in its entirety:

> Unless the terms of the trust provide to the contrary the following apply:
>
> 1. A charitable trust does not fail, in whole or in part, if a particular purpose for which the trust was created becomes impracticable, unlawful, or impossible to fulfill.
>
> 2. If a particular charitable purpose for which a trust was created becomes impracticable, unlawful, or impossible to fulfill, the court may modify the terms of the trust or direct that the property of the trust be distributed in whole or in part in a manner best meeting the settlor's general charitable purposes. If an administrative provision of a charitable trust becomes impracticable, unlawful, impossible to fulfill, or otherwise impairs the effective administration of the trust, the court may modify the provision.[7]

---

[6]Although normally we decide cases based on the law in existence at the time of the parties' dispute, we choose to cite to and analyze Iowa Code section 633A.5102 (2007) because it simply renumbers the section (by including an "A" after "633") that was in effect at the time of the parties' dispute—Iowa Code section 633.5102 (2005). *See* 2005 Iowa Acts ch. 38, § 54 (codified at Iowa Code § 633A.5102 (2007)). In addition, all citations in this opinion are to the 2007 Iowa Code unless otherwise indicated.

[7]This last sentence refers to the doctrine of equitable deviation, which we have approved in prior cases. *See, e.g.*, *In re Trust Known as Spencer Mem'l Fund*, 641 N.W.2d 771, 775–76 (Iowa 2002) (explaining the doctrine of equitable deviation but not referencing then existing Iowa Code section 633.5102(2)). The doctrine of equitable deviation is different from the doctrine of cy pres. *See* Restatement (Second) of Trusts § 381 cmt. *a* (1959) (defining the scope of rule, and contrasting it with cy pres). Typically, the difference is explained by differentiating between the methods or administrative provisions of the trust, and the trust's substantive purposes or ultimate goals. *See, e.g.*, *R.B. Plummer*, 661 N.W.2d at 312–13 ("The deviation doctrine is applicable to make changes in how a charitable trust is administered, while cy pres is used where a change of the settlor's specific charitable purpose is involved."). Thus, deviation has been used "to escape investment restrictions, to authorize transfer of certain trust property to another suitable charitable organization, and to satisfy requirements of the tax codes," Roger G. Sisson, Comment, *Relaxing the Dead Hand's Grip: Charitable Efficiency & the Doctrine of Cy Pres*, 74 Va. L. Rev. 635, 645 (1988) (footnotes omitted), as well as "to increase the number of trustees of a trust, to permit the mortgaging of charitable property, to allow trustees to charge tuition, and to eliminate a racial restriction," Chris Abbinante, Comment, *Protecting "Donor Intent" in Charitable Foundations: Wayward Trusteeship & the Barnes Foundation*, 145 U. Pa. L. Rev. 665, 684 (1997) (footnotes omitted). The difference between the two, however, is

Iowa Code § 633A.5102.  We have never before construed this section, but we are aided by what we have said regarding the common law doctrine of cy pres.  *See id.* § 633A.1104 ("Except to the extent that this chapter modifies the common law governing trusts, the common law of trusts shall supplement this trust code."); Begleiter, *Code We Trust*, 49 Drake L. Rev. at 902 (noting the similarity between the common law doctrine and our statute).  Unless the statute directs otherwise, we will construe section 633A.5102 according to the legislature's intent as aided by our precedent regarding the common law doctrine of cy pres.

**IV.  Whether the Cy Pres Doctrine in Section 633A.5102 Applies in this Case.**

Courts and commentators typically apply a three-part test to determine whether the common law doctrine of cy pres applies.  *See, e.g.*, *Obermeyer v. Bank of Am., N.A.*, 140 S.W.3d 18, 24 (Mo. 2004); E. Fisch, *The Cy Pres Doctrine in the United States* 128–38 (1950).  The test requires the presence of three criteria:  (1) a charitable trust; (2) a

---

often difficult to discern in practice.  *See, e.g.*, *In re Last Will & Testament of Teeters*, 288 N.W.2d 735, 738 (Neb. 1980) ("The dividing line between the application of the two doctrines is sometimes difficult to draw.").

The difference in proof, in terms of what conditions must exist to apply one doctrine as opposed to the other, however, is readily apparent.  At common law, the doctrine of equitable deviation was not confined to charitable trusts, *see* Restatement (Second) of Trusts § 381 cmt. *a* ("The rule stated in this Section is the same as the rule applicable to private trusts."), and because it is not used to change the purposes of the trust, it does not require a finding of general charitable intent on behalf of the settlors, *see* Wendy A. Lee, Note, *Charitable Foundations & the Argument for Efficiency: Balancing Donor Intent with Practicable Solutions Through Expanded Use of Cy Pres*, 34 Suffolk U. L. Rev. 173, 186 (2000) ("[T]here is no need to demonstrate the existence of a general charitable intent.").

It is tempting to apply the doctrine of deviation in this case, as the location of the garden is arguably not the settlors' purpose.  However, we think the specificity of the deeds regarding the location of the garden demonstrate that it is more of a substantive, as opposed to administrative, term of the trust.  Moreover, the parties have not argued deviation applies.  Furthermore, we think it is best to resolve this case under the doctrine with the more difficult standard to meet.

specific trust purpose that is illegal, impractical, or impossible; and (3) a general charitable intention by the donor. *See, e.g.*, Restatement (Second) of Trusts § 399 (1959). We have recognized this test in our case law. *See, e.g.*, *Simmons*, 256 N.W.2d at 227.

Section 633A.5102 has not changed the basic tripartite test. *See* Iowa Code § 633A.5102(1) (requiring a "charitable trust" to "become[] impracticable, unlawful, or impossible"); *id.* § 633A.5102(2) (requiring a settlor to have "general charitable purposes"); *id.* § 633A.1104 (noting the common law supplements the Iowa Trust Code). The statute does, however, begin with a caveat: "Unless the terms of the trust provide to the contrary the following apply . . . ." *Id.* § 633A.5102. Thus, the requirements of the statute, which embody the common law tripartite test, will not apply if the trust directs otherwise. This is where we begin our analysis in this case.

**A. Whether the Terms of the Trust Provide to the Contrary.** The terms of the trust do not indicate the trust should fail in the event a particular purpose of the trust becomes impracticable, unlawful, or impossible. *See id.* § 633A.5102(1) (stating the trust does not fail when a trust purpose does). The terms also fail to prohibit modification of the trust when a particular purpose becomes impracticable, unlawful, or impossible. *See id.* § 633A.5102(2) (stating the trust may be modified when a trust purpose fails). Thus, the terms of the trust do not state section 633A.5102 should not apply in this case.

Of course, it is also true the terms of the trust do not specifically endorse the directions provided in section 633A.5102. Section 633A.5102, however, effectively establishes a presumption that cy pres should apply if the trust does not state "to the contrary." *Id.*

§ 633A.5102; *see* Begleiter, *Code We Trust*, 49 Drake L. Rev. at 290–91 & n.844 ("[T]he section appears to create a presumption that cy-pres should be applied in the absence of a provision in the trust stating otherwise."). This should not be a surprise, however, as the common law has never required a charitable trust to specifically indicate cy pres should apply.

In fact, the common law has always required a similar inquiry. Under the common law we must ask whether the settlor "anticipated the possible failure of the trust and [if he or she] has made alternative disposition of his [or her] property to meet that contingency." *Simmons*, 256 N.W.2d at 227. If so, cy pres could not be applied because in the words of our statute, the trust stated "to the contrary." Iowa Code § 633A.5102.

In this case, the settlors did not anticipate the failure of the trust. The initial 1968 agreement stated the garden was to "continue during the period of the trust as created in [Henry's] Will." Henry did not establish a testamentary trust, however, and the inter vivos trust he created does not mention any period of duration or otherwise indicate the settlors anticipated its failure.[8] In addition, there is nothing to indicate the settlors had an alternative plan if there was a failure. *See, e.g.*, *Rothrock*, 452 N.W.2d at 406 (noting the absence of a forfeiture or reversion clause). As a result, we do not think our statute or the common law initially precludes the application of the cy pres doctrine.

---

[8]In fact, there are several circumstances to indicate the settlors intended the trust to last forever and only anticipated its success: it provided the garden could be extended if enough funds were available, it funded a memorial, the fountain was built with incredible durability, and a successor trustee was named.

**B. Whether the Robert James Kolb Memorial Trust Fund is a Charitable Trust.**

Section 633A.5102 only applies to charitable trusts. *See* Iowa Code § 633A.5102 (listing the section under the subchapter "Charitable Trusts"); Restatement (Second) of Trusts § 399 cmt. *a* ("The doctrine is not applicable to private trusts . . . ."). A trust established to support a city flower garden demonstrates a charitable purpose. *See* Iowa Code § 633A.5101(1) (noting a charitable trust may be created for any purpose "beneficial to the community"); Restatement (First) of Trusts § 368(e), (f) (1935) (defining governmental or municipal purposes and those that benefit the community as charitable purposes). A flower garden enhances the beauty of its surroundings for the benefit of others who take the time to enjoy it. "Thus, the property was held by the trustee for a charitable purpose and is a charitable trust." *Rothrock*, 452 N.W.2d at 405 (citing Restatement (Second) of Torts § 348).

**C. Whether a Particular Trust Purpose has Become Impossible, Impracticable or Unlawful.**

We must also determine whether "a particular purpose for which the trust was created [has] become[] impracticable, unlawful, or impossible to fulfill." Iowa Code § 633A.5102(1); *see* Begleiter, *Code We Trust*, 49 Drake L. Rev. at 290 (noting one must "[d]etermine whether the original trust purpose was impossible to fulfill, illegal or impracticable— in the sense that to devote funds would not fulfill the settlor's intention"). There is no claim of unlawfulness; the parties and district court have focused solely on whether the purpose of funding the improvement and maintenance of the garden at the surveyed location has become impracticable or impossible.[9]

---

[9]Whether it was impossible or impracticable to fund the fountain at its original location is not specifically a question before us, as the trust only provided for the

A review of the case law on impossibility and impracticability has led many to believe "no precise definition of the standard exists," and whether something has become impossible or impracticable is up to the "particular facts of each case." Nancy A. McLaughlin, *Rethinking the Perpetual Nature of Conservation Easements*, 29 Harv. Envtl. L. Rev. 421, 465 (2005). We agree. We also believe the particular facts of this case reveal it was impracticable to fund the garden at its original location.

The record reveals Project Awaysis is a multi-million dollar endeavor, funded in part by Vision Iowa. The evidence clearly indicates the City devoted considerable thought and planning to the project. Moreover, and although contested, there is evidence the City would have preferred to keep the garden and fountain at their original locations. The project manager plainly testified of the need for the garden and fountain to be moved. Otherwise, the lodge and aquatic facilities could not be built adjacent to each other, which the planners believed was essential to the project's success. Such a massive project should be planned in a way that maximizes its potential, and when the location of the garden and fountain jeopardize that potential it becomes impractical not to relocate them. As a result, we think it would be impracticable to fund the garden at its original location. *See Rothrock*, 452 N.W.2d at 406 (applying cy pres because it was impractical to carry out the particular trust purpose).

In addition, it is now certainly impossible to fulfill this particular purpose of the trust. The City voluntarily destroyed the garden and

_____

construction of the fountain, although in practice the funds were used to maintain the fountain, too. Moreover, we do not feel this distinction merits a different analysis regarding the fountain's relocation. The cy pres doctrine will either permit the relocation of both, or none.

fountain to begin the construction of Project Awaysis. It has no intention of rebuilding them at their original locations. Consequently, it is literally impossible for the trust to fund the garden at its original location.

Of course, it was not impossible for the trust to fund the garden until the City voluntarily destroyed the garden and fountain. Thus, the City caused the impossibility. Furthermore, the City caused the impracticability by planning and moving forward with Project Awaysis. Some courts have recognized that a trustee or donee cannot invoke the doctrine of cy pres when he or she causes the impossibility, impracticability, or illegality. *See, e.g., Conn. Coll. v. United States*, 276 F.2d 491, 497–98 (D.C. Cir. 1960) ("Nor may a trustee by his own act produce changed conditions which frustrate the donor's intention and still claim the gift through the application of the cy pres doctrine."). We have at least hinted at such a rule in one of our cases. *See Curtis & Barker v. Cent. Univ. of Iowa,* 188 Iowa 300, 322, 176 N.W. 330, 338 (1920) ("It occurs to us that [donee], having voluntarily put it beyond its power to carry out the purposes of the donors as to the denominational control of the college, is not in a position to ask that this fund be disposed of cy pres.").

We do not believe, however, that a per se rule against the cy pres doctrine exists when the trustee or donee causes the impracticability, impossibility, or illegality. The rule against cy pres in such a case has been justified because permitting modification would allow the trustee or donee to "disregard the express terms of the grant or devise." *President & Fellows of Harvard Coll. v. Jewett*, 11 F.2d 119, 122 (6th Cir. 1925). But there are circumstances when a "natural and unavoidable change in conditions or circumstances" causes the trustee or donee to act. *Id.* In

such cases, we think a proper disregard for the grant or devise may be maintained by the donee or trustee that does not preclude the application of cy pres. *See id.*; *see also Howard Sav. Inst. of Newark v. Peep*, 170 A.2d 39, 47–48 (N.J. 1961) (noting the changed circumstances "were not merely to serve trustee convenience"). After all, the trustee or donee is the cause of the impossibility or impracticability in most cases. *See, e.g.*, *Rothrock*, 452 N.W.2d at 404 (noting donee wanted to use trust funds for more than what trust specified). Moreover, our hint in *Curtis* was dicta, and we commented on "the question [of cy pres] but briefly" because the appellant/donee had not briefed or argued it. 188 Iowa at 321–22, 176 N.W. at 335–37 (resolving the case under "the more important questions" of contract law). Thus, we refuse to adopt a per se rule that a trustee or donee may not invoke the doctrine of cy pres when he or she causes the impossibility, impracticability, or illegality.

We also believe the City's actions in this case, while causing the impracticability and impossibility, are the result of "natural and unavoidable" changes. It is only natural for a city to respond to the inevitable changes in its economic and societal needs. Project Awaysis provided that response. Moreover, it was unavoidable in the sense that a city has the responsibility to make improvements, whether it is to roads, public buildings, or city parks. It was also unavoidable in the sense we have already indicated: the plans for Project Awaysis required the removal of the garden and fountain. While the settlors specifically wanted the trust to fund the garden at a particular location within the park, the City is not improperly disregarding the express terms of the trust by planning an economic revitalization project that requires the garden to be moved.

**D. Whether the Settlors had General Charitable Intent.**

We must next consider whether the settlor, or settlors in this case, had "general charitable purposes," or what is recognized at common law as general charitable intent. *See* Iowa Code § 633A.5102(2) (recognizing the settlor must have "general charitable purposes"); Begleiter, *Code We Trust*, 49 Drake L. Rev. at 290 (noting the court must next "[d]etermine whether settlor had a general charitable intent—his purpose was not to benefit or accomplish one specific object"). Similar to our evaluation of impracticability and impossibility, there are "no hard and fast rules" to determine whether the settlors had general charitable intent. *Miller v. Mercantile-Safe Deposit & Trust Co.*, 168 A.2d 184, 189 (Md. 1961). Instead, we must evaluate all the relevant facts and circumstances, which may include extrinsic evidence not included in the trust document, *Nat'l Soc'y of Daughters of Am. Revolution v. Goodman*, 736 A.2d 1205, 1210 (Md. 1999), and we will make an effort to find a general charitable intent when possible, *Bd. of Trs. of Univ. of N. Carolina v. Unknown & Unascertained Heirs*, 319 S.E.2d 239, 242 (N.C. 1984).

It is hard to define general charitable intent. Perhaps the best explanation embraces the concept that it would not reject the continuation of the trust when a particular purpose of the trust fails. This concept draws on several cases where we have recognized the lack of a forfeiture or reversion clause supports a finding of general charitable intent. *See, e.g., Mary Franklin Home for Aged Women v. Edson*, 193 Iowa 567, 571, 187 N.W. 546, 549 (1922). As we noted earlier, there is no such clause in this case.

But there is a clause, in fact several clauses, in the trust that specifically indicate the trust is to fund the garden's improvement and

maintenance at the original surveyed location. Both warranty deeds stated the "trust fund shall be used in connection with improvements [for the garden] upon the tract of real estate hereinafter described, as follows: [legal description of garden location]." They also referred to the funds being used "for the maintenance of the park area herein described." Such specificity is normally a strong argument that the settlors had specific, rather than general, charitable intent.

Nevertheless, our previous cases have indicated that unless the specific purpose is the primary, dominant or essential purpose, cy pres may still be applied. For example, we have stated

> "that, if the mode of application is such an essential part of the gift that you cannot distinguish any general purpose of charity, but are obliged to say that the mode of doing a charitable act was the only one the testator intended or at all contemplated, and that he had no general intention of giving his money to charity, then the court cannot, if the particular mode of doing it fails, apply the money cy pres."

*Hodge v. Wellman,* 191 Iowa 877, 883–84, 179 N.W. 534, 537 (1920) (quoting *Brown v. Condit,* 61 A. 1055, 1057 (N.J. Super. Ct. Ch. Div. 1905)). In other words, if the specific purpose of the trust is so essential that it becomes the dominant purpose of the trust, then there is no other "general purpose of charity" that can be fulfilled cy pres. *See id.* ("What, then, was the dominant purpose of the testator?"); *Mary Franklin Home,* 193 Iowa at 574, 187 N.W. at 549 (looking into the "general or dominant purpose" of the donor).

The location of the garden and fountain was certainly important to the settlors. They felt it provided the ideal setting. But the record discloses no other reason, personal or unique to the settlors, that existed for their choice. Importantly, the garden was not established by the Kolbs to memorialize an event that occurred at the designated location.

Moreover, the appellee's testimony that the settlors would not have wanted the trust funds to be spent on the garden at any other location is contradicted by his actions as trustee. He permitted trust funds to buy property for the school district, and he initially supported a petition to relocate the garden. While we must remain focused on the settlors' intentions, these actions discredit the trustee's testimony regarding their intentions. Furthermore, the settlors named the trust the "James Kolb Memorial Trust Fund," and indicated in all the documents an intent to benefit "the City of Storm Lake," or that the trust was for "the use and benefit of the City of Storm Lake, Iowa." Under such circumstances, we do not believe funding the garden at the surveyed location was essential, or that it was the dominant or primary purpose. Instead, the settlors' primary or dominant purpose was to perpetually honor their grandson and benefit the City. This is evidence of " 'a more general intention to devote the property to charitable purposes,' " and demonstrates the designated site was not part of the broader trust purposes. *Simmons,* 256 N.W.2d at 227 (quoting the Restatement (Second) of Trusts, § 399).

Finally, we are guided by our answer to the ultimate question: whether, under the circumstances, would the Kolbs, the settlors, have wanted the trust to continue in light of the changes brought on by Project Awaysis? *See Nat'l Soc'y of Daughters of Am. Revolution,* 736 A.2d at 1210 (describing this as "the pertinent inquiry" when "determining whether the [settlor] possessed a general charitable intent"). The record clearly indicates the settlors wanted the garden and fountain to be permanent additions in the City's park. They were, in the words of appellee, created by the "blood and guts" of the settlors, constructed to withstand the tests of time, and funded by what seems to be an

everlasting trust. No doubt they would have been disappointed about the plans that required the relocation of the garden and fountain, and their ultimate destruction. But we think they would have been even more disappointed in the complete failure of the trust and their eleemosynary ends. After all, the settlors specifically indicated in their original agreement with the City that the trust was to be a "permanent fund." As a result, we believe the settlors would have preferred the trust to continue under cy pres if they were alive today, so that the City can continue to display the flowers in the lakeside park in honor of the memory of their deceased grandson.

**V. Whether the City's Request to Modify the Trust is Permissible.**

In applying cy pres under section 633A.5102, we must keep in mind it "is a liberal rule of construction used to carry out, not defeat, the [settlors'] intent." *Rothrock,* 452 N.W.2d at 405–06. Thus, we cannot approve a cy pres modification that would defeat the settlors' intent. The City has only requested the trust be modified so its funds may be used for the maintenance of the garden at a new location. The record indicates this new location is to be very close to the original location, and the size of the garden is to be about the same. In addition, the record reveals the City would use the memorial plaques and any other vestige from the prior location, including the construction of a new fountain, to accompany the garden at the new location. Our statute clearly allows for such a modification, and we see no reason why this would defeat the settlors' intent in this case. In fact, it is precisely our belief that it would fulfill the settlors' intent. Of course, should the City, trustee or any other

interested party wish to further modify the trust beyond the scope of what was requested here, another application for cy pres must be made.

## VI. Conclusion.

We conclude the cy pres doctrine under Iowa Code section 633A.5102 applies to the trust under the circumstances of this case. All of the conditions required for its application are met, and therefore the trust does not fail. Moreover, the City's proposed modification fits within what is "cy pres comme possible" to the settlors' intentions. Such a result is consistent with our general favor for upholding charitable trusts. *See Simmons*, 256 N.W.2d at 227 ("[C]haritable trusts are favored by the law."). It is also consistent with our propensity to apply the doctrine when the trust has existed for a long time, rather than failing at the outset. *See id.* (stating we are more reluctant to apply the doctrine when the "trust failed at the outset rather than after it had been under administration for some time"). In this case, of course, the trust has been in existence for over thirty years, and we see no reason why it cannot continue under the modification we have approved well into the future.

We reverse and remand for proceedings consistent with this opinion, including a hearing on the request for an accounting and the removal—perhaps now the appointment—of trustee. *See, e.g.*, Iowa Code § 633A.4107 ("Removal of trustee."); *Schildberg v. Schildberg*, 461 N.W.2d 186, 190 (Iowa 1990) (determining whether the trustee should be removed and recognizing a trustee's duty to account).

**REVERSED AND REMANDED.**