# In the Iowa Supreme Court

No. 25–0462

Submitted April 15, 2026—Filed June 5, 2026

In re **Ezra L. Totton Scholarship.**

**University of Iowa,**

Appellant.

Appeal from the Iowa District Court for Johnson County, Chad Kepros, judge.

A university appeals the dismissal of its action under Iowa Code section 540A.106(3) seeking to modify the terms of a scholarship gift. **Reversed and Case Remanded.**

Mansfield, J., delivered the opinion of the court, in which Christensen, C.J., and Waterman, Oxley, and McDermott, JJ., joined. McDonald, J., filed an opinion concurring in part and concurring in the judgment, in which May, J., joined.

Brenna Bird, Attorney General; Eric Wessan (argued), Solicitor General; and Halle B. Kissell and Ian M. Jongewaard (until withdrawal), Assistant Solicitors General, for appellant.

Rita Bettis Austen (argued) and Thomas D. Story of ACLU of Iowa, Des Moines, for amicus curiae ACLU of Iowa; David S. Walker and Russell E. Lovell, II, Des Moines, for amicus curiae NAACP Iowa-Nebraska Conference; ReNika C. Moore and Sarah Hinger of American Civil Liberties Union Foundation, New York, New York, and Julie A. Murray of American Civil Liberties Union Foundation, Washington D.C., for amicus curiae American Civil Liberties Union

Foundation; and Anthony Ashton of NAACP, Baltimore, Maryland, for amicus curiae NAACP.

**Mansfield, Justice.**

### I. Introduction.

Several decades ago, out of gratitude to the University of Iowa for educating him in its graduate chemistry program during the Jim Crow era, a distinguished Black professor of chemistry left a scholarship bequest to the University. The bequest established a scholarship for "Black students majoring in the physical sciences, preferably chemistry," at the University.

Three years ago, the United States Supreme Court ruled in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College* (*SFFA*), 600 U.S. 181, 230 (2023), that universities could not use race-based preferences in admissions. The University believed that this decision raised serious doubts about its ability to administer the scholarship going forward, so it brought a legal proceeding to modify those terms, as authorized by Iowa Code section 540A.106(3) (2025). Specifically, the University sought to replace "Black" with "first generation."

The district court dismissed the action without prejudice. In its view, no legal authority conclusively demonstrated that it would be unlawful to continue the scholarship under its existing terms. The University appeals.

On appeal, we conclude that it is at least "impracticable" to administer the scholarship as is. Iowa Code § 540A.106(3). But we do not find support for the University's proposed modification. Therefore, we reverse this case and remand so that the district court may consider other modifications. We give the following guidance on remand: (1) an advocate for the donor's intent should be allowed to participate in the proceeding, (2) the entire terms of the will and relevant extrinsic evidence may be considered, and (3) modifications that may be

considered include release of the restriction or an order that the funds be paid without the restriction to another institution.

## II. Facts and Procedural History.

**A. Dr. Totton's Bequest to the University.** Nearly thirty years ago, in March 1997, the University received notice of a bequest from the Last Will and Testament of Ezra L. Totton, Ph.D. The bequest stated,

> A share is bequeathed to the University of Iowa to establish a scholarship named the "Ezra L. Totton Scholarship" for Black students majoring in the physical sciences, preferably chemistry. This money is to be invested and 90% of the interest each year is to provide. This scholarship will be presented to the State University as an alumni contribution.

A check for $35,000 was enclosed. The attorney for Dr. Totton's estate advised, "If you are unable to comply with the requirements of this bequest, please return the check and notify us immediately." The attorney also informed the University that five charities in total were sharing equally in 40% of Dr. Totton's estate, with the remaining 60% going to his family.

The University accepted the bequest after clarifying that the 90% of the interest annually was to be used to "provide *for the scholarship.*" (Emphasis added.) Since then, the money has funded a scholarship each year for Black students majoring in chemistry. The endowment has grown to approximately $58,015.58.

**B. The University's Application to Modify the Terms of the Gift.** In June 2023, the United States Supreme Court decided *SFFA*, 600 U.S. 181. In that case, the Court held that college admissions programs in which the race of the applicant played a role violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Title VI of the Civil Rights Act of 1964. *Id.* at 198 n.2, 230.

In January 2025, the University, represented by the attorney general, brought the present action in the Johnson County District Court under Iowa Code chapter 540A, the Uniform Prudent Management of Institutional Funds Act (UPMIFA). Citing *SFFA,* the University alleged that "it may be unlawful to carry out the purpose of the Fund as originally contemplated by [Dr.] Totton" and sought court approval to modify the gift. The University proposed changing "Black students" to "first generation students," while otherwise leaving the terms of the gift in place.

Section 540A.106(3) of UPMIFA requires the institution seeking to modify the gift to notify the attorney general, who "shall be given the opportunity to be heard." *Id.* § 540A.106(3). The uniform laws act commentary to UPMIFA explains that "[t]he attorney general protects donor intent as well as the public's interest in charitable assets." Nat'l Conf. of Comm'rs on Unif. State L., *Uniform Prudent Management of Institutional Funds Act* § 6 cmt. (2006) [hereinafter UPMIFA Final Act].

Thus, the University alleged in its application that it would notify the attorney general. However, recognizing that the attorney general *also* represents the University, the University alleged that "[t]he Attorney General's Office set up a legal ethics screen due to [the University's attorney] being an Assistant Attorney General within the Attorney General's Office." Nonetheless, no one from the attorney general's office appeared except as attorney for the University.

Iowa Code section 540A.106(3) also requires notification of any donor or donor's designee. Dr. Totton, of course, had passed, and the University alleged in its petition that "there are no known formal donor designees."

The district court declined to order the requested modification. It stated that it was "not clear to the court that [*SFFA*] has been conclusively determined

to apply to scholarships that have been donated to an academic institution and designated as provided for in the scholarship at issue." It invited the University to make any further submissions within the next thirty days, cautioning that it would otherwise dismiss the case without prejudice.

The University responded with an amended application that provided additional detail on the *SFFA* decision and alleged—more definitively—that "*it is now unlawful* to carry out the purpose of the Fund as originally contemplated by [Dr.] Totton." (Emphasis added.)

After receiving the amended application, the district court issued a second order, stating, "There still has been no authority presented to the Court showing that [*SFFA*] has been conclusively determined to apply to gift instruments that have been donated to an academic institution and designated as provided for in the gift instrument." The court therefore dismissed the matter without prejudice.

**C. Amicus Participation on Appeal.** The University appealed, and we retained the appeal. After the University filed its opening brief, we entered an order expressing our view that the appeal would benefit from further briefing and requesting the appearance of an amicus curiae to defend the district court's order. The NAACP Iowa-Nebraska Conference and the American Civil Liberties Union of Iowa agreed to appear jointly as amici and submitted a brief. The University was given leave to file a supplemental brief in response to the amicus brief.

The amicus brief was accompanied by an appendix. The appendix contains considerable information about Dr. Totton that was not in the record below.[1]

---

[1]The University objects to our consideration of this information but not to its accuracy.

Totton was born in 1908. He graduated with a bachelor of science degree from Knoxville College, a historically Black college or university (HBCU), in 1935. In 1939, Totton was denied admission to the graduate program in chemistry at the University of Tennessee under a Tennessee law that made it a misdemeanor for any school to permit white and Black students to attend the same school or classes. Totton and five other Black prospective students filed a lawsuit against the University of Tennessee challenging the law under the Equal Protection Clause. In 1942, the Supreme Court of Tennessee dismissed the lawsuit. *See State ex rel. Michael v. Witham*, 165 S.W.2d 378, 381–82 (Tenn. 1942) (citing *Plessy v. Ferguson*, 163 U.S. 537 (1896), *overruled by*, *Brown v. Bd. of Educ.*, 347 U.S. 483 (1954)) (noting that Black students receive "equal facilities of instruction," and asking, "What more could be demanded?").

After serving three years in a segregated unit in the Army during World War II, Totton was admitted to the University of Iowa, where he received a master of science degree in chemistry. He went on to receive his doctorate in biochemistry-organic chemistry from the University of Wisconsin-Madison and to complete postdoctoral studies at Stanford University. In 1949, Dr. Totton accepted a position as chair of the chemistry department at North Carolina Central University, another HBCU. Dr. Totton remained there twenty-six years until he took emeritus status in 1976.

Dr. Totton executed his will in 1991, and he died in 1996. In his will, he left 60% of his estate to family members. He bequeathed the remaining 40% to his five "favorite charit[ies] in equal shares": Knoxville College, North Carolina Central, the University of Iowa, the University of Wisconsin, and White Rock Baptist Church. The White Rock Baptist Church gift was to be used for "a scholarship for students majoring in the physical sciences." Both the Knoxville

College and the North Carolina Central gifts were to be used for students majoring in chemistry. The University of Iowa gift, as noted, was for "Black students majoring in the physical sciences, preferably chemistry." The University of Wisconsin scholarship was for "Black students majoring in Biochemistry."

The appendix also includes declarations from a nephew of Dr. Totton and a former teaching colleague of Dr. Totton. Both of them contend that Dr. Totton's purpose was to support Black students in higher education and that he would have objected to the modification proposed by the University.

In its supplemental brief, the University continues to argue that the gift should be modified to benefit first-generation students majoring in chemistry rather than Black students majoring in chemistry. The amici do not dispute that the original restriction to Black students has become "impracticable"—if not illegal—in light of *SFFA*, but they strenuously oppose the University's requested modification.

### III. Standard of Review.

This case was brought as an equity action below, and the relief sought by the University is equitable. Our review is de novo. *In re Coe Coll.*, 935 N.W.2d 581, 586 (Iowa 2019).[2]

### IV. Analysis.

**A. The Legal Framework.** "Our general assembly enacted the Uniform Prudent Management of Institutional Funds Act (UPMIFA) in 2008." *Id.* at 591; *see* 2008 Iowa Acts ch. 1066 (codified at Iowa Code ch. 540A (2009)). The UPMIFA provides in part,

---

[2]We do not decide what the standard for review would be for a specific modification if the district court had made one. *See Kolb v. City of Storm Lake*, 736 N.W.2d 546, 552 (Iowa 2007) ("An abuse of discretion standard may be proper when the question is whether the court's modification under cy pres is appropriate.").

If a particular charitable purpose or a restriction contained in a gift instrument on the use of an institutional fund becomes unlawful, impracticable, or impossible to fulfill, the court, upon application of an institution, may modify the purpose of the fund or the restriction on the use of the fund in a manner consistent with the charitable purposes expressed in the gift instrument. The institution shall notify the attorney general of the application and the attorney general shall be given the opportunity to be heard. If the donor or the donor's designee having the right to enforce the restrictions under subsection 5 provides the institution with an address, then the institution shall also notify the donor or such designee of the application by United States mail addressed to the last address so provided and the donor or such designee shall have an opportunity to be heard.

Iowa Code § 540A.106(3).

The comment to the uniform version of this section explains,

**Modification of Restrictions on Charitable Funds.** UPMIFA clarifies that the doctrines of cy pres and deviation apply to funds held by nonprofit corporations as well as to funds held by charitable trusts. Courts have applied trust law rules to nonprofit corporations in the past, but the Drafting Committee believed that statutory authority for applying these principles to nonprofit corporations would be helpful. . . . Under UPMIFA, as under trust law, the court will determine whether and how to apply cy pres or deviation and the attorney general will receive notice and have the opportunity to participate in the proceeding.

UPMIFA Final Act, Prefatory Note.

The University, represented by the attorney general, brought this action pursuant to section 540A.106(3) alleging that the restriction in Dr. Totton's gift to Black students "may be" or "is" unlawful. The University asks that "Black students" be changed to "first generation students."

We must decide:

(1) Is the restriction unlawful, impracticable, or impossible to fulfill?

(2) If so, is the University's proposed modification appropriate?

(3) If the University's proposed modification is not appropriate, what should happen next?

**B. Is the Restriction Unlawful or Impracticable?** We see *SFFA* in a different light than the district court did. *SFFA* held that the race-based admissions programs at two universities violated the Equal Protection Clause. 600 U.S. at 213. But its rationale extends beyond admissions. The *SFFA* Court stated the following regarding race-based admissions:

> [W]e have permitted race-based admissions only within the confines of narrow restrictions. University programs must comply with strict scrutiny, they may never use race as a stereotype or negative, and— at some point—they must end. Respondents' admissions systems— however well intentioned and implemented in good faith—fail each of these criteria. They must therefore be invalidated under the Equal Protection Clause of the Fourteenth Amendment.

*Id.*

Significantly, though, the Court placed that decision in a broader context in which the Equal Protection Clause prohibits all racial discrimination by the government unless strict scrutiny has been met: "Eliminating racial discrimination means eliminating all of it." *Id.* at 206. The Court elaborated,

> [O]ur precedents have identified only two compelling interests that permit resort to *race-based government action.* One is remediating specific, identified instances of past discrimination that violated the Constitution or a statute. The second is avoiding imminent and serious risks to human safety in prisons, such as a race riot.

*Id.* at 207 (citations omitted and emphasis added). Thus, we read *SFFA* as banning all race-based action by the government unless the strict scrutiny standard has been met.

Lower courts and the federal government have recognized that *SFFA* sweeps more broadly than admissions.

A Wisconsin appellate court held that a state-funded program providing scholarships to financially needy Black, American Indian, and Hispanic undergraduate students enrolled in private Wisconsin colleges violated the Equal

Protection Clause. *Rabiebna v. Higher Educ. Aids Bd.*, 20 N.W.3d 742, 747, 772–73 (Wis. Ct. App. 2025), *review granted*, 30 N.W.3d 26 (Wis. 2025). The court noted the breadth of the *SFFA* decision, observing that while the state

> attempts to limit the holding of *SFFA* to only race-based college admissions programs, the *SFFA* Court did not so limit the application of the equal protection principles it articulated. Indeed, those principles appear to apply to nearly every context in which government attempts to use race, national origin, ancestry or alienage as a discriminating factor, just as the principles articulated in *Brown* were applied by lower courts and the Supreme Court to "invalidate[] all manner of race-based state action" in the years following that decision. In short, except in the extremely limited and "most extraordinary" circumstances identified in *SFFA*, government funding or support designed to provide a benefit or cause a detriment to persons based even in part on their race, national origin, or ancestry cannot stand.

*Id.* at 773 (alteration in original) (citations omitted).

Several months ago, a federal district court denied a motion to dismiss a challenge to the American Bar Association's (ABA) race-based law school scholarship program. *Am. All. for Equal Rts. v. A.B.A.*, 2026 WL 161596, at *6–8 (N.D. Ill. Jan. 21, 2026). The challenge was based on a post-Civil War civil rights statute, 42 U.S.C. § 1981, that prohibits racial discrimination in contracting. *Am. All. for Equal Rts.*, 2026 WL 161596, at *5. The court held that the complaint plausibly alleged the existence of a contractual relationship between the ABA and the scholarship recipients and, therefore, the lawsuit could go forward. *Id.* at *6–8.

These cases do not appear to be outliers. The Office of Legal Counsel of the United States Department of Justice has recently issued a memorandum opinion for the United States Department of Education concerning race-based scholarships. *Constitutionality of Race-Based Department of Education Programs*, 49 Op. O.L.C. (Dec. 2, 2025) (slip op.). The memorandum opinion takes the view

that in light of *SFFA*, federally funded scholarship programs cannot favor specific races, *id.* at 31, nor may the federal government offer preferential access to student financial data to organizations that make scholarship awards based on race, *id.* at 45–47.

Here, the scholarship funds came from Dr. Totton's estate, and the directive as to their use came from him. But there is no dispute that they are currently held, administered, and distributed by the University in accordance with a race-based restriction. We concur in the view of the attorney general and the amici that this restriction is at least "impracticable" under UPMIFA.

The district court concluded that the University's action was premature because there had been "no authority presented to the Court showing that [*SFFA*] has been conclusively determined to apply to gift instruments that have been donated to an academic institution and designated as provided for in the gift instrument." Yet under Iowa Code section 540A.106(3), the restriction doesn't have to be conclusively demonstrated to be illegal. It's enough if it has become impracticable. *Id.* Both the University and the amici acknowledge that the Scholarship's race-based restriction has become impracticable in light of *SFFA*. We agree.

The "unlawful, impracticable, or impossible" test in UPMIFA for modifying a gift restriction resembles the standard for *cy pres. Id.*; *see also In re Coe Coll.*, 935 N.W.2d at 593 (stating that section 540A.106 "overlaps to some extent with what the recipient of a charitable gift must prove to invoke *cy pres*"). In fact, Iowa Code section 540A.106(7) itself states that section 540A.106 "does not limit the application of the judicial power of cy pres."

> The *cy pres* doctrine refers to "[t]he equitable doctrine under which a court reforms a written instrument with a gift to charity as closely

to the donor's intention as possible, so that the gift does not fail."
*Cy Pres*, *Black's Law Dictionary* (11th ed. 2019).

*In re Coe Coll.*, 935 N.W.2d at 593 (alteration in original).

Our legislature codified *cy pres* for charitable trusts in 1999. 1999 Iowa Acts ch. 125, § 86 (codified at Iowa Code § 633A.5102 (2001)); *see also In re Coe Coll.*, 935 N.W.2d at 593. Like UPMIFA, *cy pres* comes into play when a specific charitable trust purpose has become "impracticable, unlawful, or impossible to fulfill." Iowa Code § 633A.5102(2); *see also In re Coe Coll.*, 935 N.W.2d at 594–95 (applying this standard).

Whether a gift restriction has become impracticable under *cy pres* depends on the "particular facts of each case." *In re Coe Coll.*, 935 N.W.2d at 594 (quoting *Kolb v. City of Storm Lake*, 736 N.W.2d 546, 556 (Iowa 2007)). For example, in *Kolb v. City of Storm Lake*, we applied *cy pres* to move a memorial fountain and flower garden from their original location to a new location in the same city park. 736 N.W.2d at 560. The garden was in the path of a proposed economic revitalization project. *Id.* at 551. Before construction began, it would not have been illegal or impossible to continue the garden at its original location; a development project simply took priority and made it "impracticable to fund the garden at its original location." *Id.* at 557.

We conclude that it is impracticable for the University to distribute scholarship funds under a race-based restriction. The University convincingly demonstrates that, at a minimum, it would be subject to litigation risk with the federal government. For instance, last year, the United States Department of Education's Office for Civil Rights announced several investigations under Title VI related to universities offering race-limited scholarships. *See* Press Release, U.S. Dep't of Educ., *Office for Civil Rights Initiates Title VI Investigations into Institutions of Higher Education*, (Mar. 14, 2025),

https://www.ed.gov/about/news/press-release/office-civil-rights-initiates-title-vi-investigations-institutions-of-higher-education [https://perma.cc/UCY7-8KQE].

**C. Is the University's Modification Appropriate?** Iowa Code section 540A.106(3) provides that when a fund restriction becomes illegal, impracticable, or impossible, the court "may modify the purpose of the fund or the restriction on the use of the fund in a manner consistent with the charitable purposes expressed in the gift instrument." We now turn to the University's proposal to modify the gift restriction so that it benefits first-generation students.

We are not persuaded that the University's modification is consistent with the charitable purposes expressed in the gift instrument or that it is otherwise appropriate. There is no support for it in the sparse record. Dr. Totton gave funds to assist "Black students majoring in the physical sciences, preferably chemistry." We have no indication that Dr. Totton would have wanted to assist first-generation students as a backup plan. Rather, the record indicates that the funds were to be returned if the gift terms could not be met.

In its opening brief, the University argues that its modification "preserves the core charitable purpose while removing the unlawful race-based restriction." We disagree with this characterization. The modification *adds a new restriction.*

In its later brief responding to the amici, the University shifts gears and argues that its new restriction "targets students historically underrepresented and facing structural barriers to higher education." According to the University, it "advances [Dr.] Totton's original goal of supporting students in the physical sciences who might otherwise lack access."

But again, we have no indication that Dr. Totton would have wanted his gift to further the University's new goal. There is a world of difference between Dr. Totton's experience as a victim of a pernicious regime of de jure racial

segregation, *see Witham*, 165 S.W.2d at 381–82, and the life of a first-generation college student today at the University.

We do not rule out the possibility that on a different record, a modification of the terms of the gift to benefit first-generation students could be appropriate. But it isn't supported by the present record.

**D. Next Steps.** Because it is impracticable for the University to distribute the scholarship funds in accordance with the racial restriction, yet we do not agree with the University's proposed modification, we must remand this case to the district court for further proceedings. To guide the district court on remand, we note the following.

1. *Participation by others in the proceeding.* Iowa Code section 540A.106 contemplates participation by an advocate for the donor's charitable intent. Normally, that would be the attorney general. *See id.* § 540A.106(3) ("The institution shall notify the attorney general of the application and the attorney general shall be given the opportunity to be heard."); *see also In re Coe Coll.*, 935 N.W.2d at 586 (discussing the institution's notification of the attorney general and his participation in the litigation).

In *cy pres* proceedings, the attorney general's job is to protect the charitable trust. "The community's interest in the enforcement of a charitable trust must be vindicated by the attorney general." *Mitchellville Cmty. Ctr., Inc. v. Vos* (*In re Clement Tr.*), 679 N.W.2d 31, 37 (Iowa 2004). "[I]t is the duty of the attorney general to protect the public interest in charitable trusts, and we must assume this official will do his duty." *Busch v. Baute* (*In re Est. of Ditz*), 117 N.W.2d 825, 830 (Iowa 1962).

But here, the attorney general represents the University. The attorney general alleges that an "ethics screen" has been established so that another part

of the attorney general's office may continue to protect the donor's intent in this proceeding. Without expressing our view on whether such an arrangement would be workable, we note that no one from the attorney general's office has actually appeared to represent the donor's intent in this matter.

Historically, we have been reluctant to grant party status in *cy pres* proceedings to persons other than the entity administering the charitable gift and the attorney general. Thus, in *Amundson v. Kletzing-McLaughlin Memorial Foundation College*, 73 N.W.2d 114, 115 (Iowa 1955), we found that a surviving donor and the heirs of the other donor lacked standing to enforce a charitable trust. We explained that "[t]he settlor of a trust or his heirs cannot sue to enforce the trust unless there is some reservation or condition which amounts to a property interest therein." *Id.* at 116–17. Absent a remainder or reversionary interest in the event of a failure of a trust, the "[p]laintiffs' only interest in the college is a sentimental one which is not sufficient basis for enlisting aid of the court." *Id.* at 117. Because the plaintiffs did not stand to benefit from the execution of the trust, nor did they suffer any financial loss, they were not entitled to sue "as members of the public [that] may benefit from enforcement of the trust." *Id.*

Later, we observed, "Generally, the attorney general or a person who has a special interest in the enforcement of a charitable trust, rather than the settlor or his heirs, can maintain a suit to enforce the provisions." *In re Tr. of Rothrock*, 452 N.W.2d 403, 405 (Iowa 1990).

In 1999, as previously noted, our legislature codified the doctrine of *cy pres* for charitable trusts. In doing so, it provided,

> The settlor, the trustee, the attorney general, and any charitable entity or other person with a special interest in the trust

shall be interested persons in a proceeding involving a charitable trust.

1999 Iowa Acts ch. 125, § 88 (codified at Iowa Code § 633.5104 (2001)).[3]

We thereafter decided *Mitchellville Community Center, Inc. v. Vos* (*In re Clement Trust*), 679 N.W.2d 31, where we applied the statute as well as our prior common law on *cy pres* standing. There, a will had created a trust to sponsor senior citizen programs and activities. *Id.* at 33. In furtherance of that purpose, the trustees "decided to contribute to community centers that housed a senior citizen center" and "contributed to the construction of buildings for such centers." *Id.* The trustees provisionally agreed to donate funds for one such center, but placed conditions on that funding as to how the center needed to be built and operated. *Id.* at 34. The community group that was to receive the funds failed to comply with all of the requirements, and so the trust withheld the funding and instead decided to construct its own senior citizen center in the same town. *Id.* at 34–35. This did not satisfy the community group: "After an unsuccessful attempt to have the attorney general challenge the trust's actions, [the community group] filed a petition against the trustees, alleging they had unreasonably exercised their discretionary powers." *Id.* at 35. The community group "asked the court (1) to enjoin further trust expenditures absent court order; (2) to determine the trustees acted unreasonably and contrary to the terms of the trust; [and] (3) to rule that the trust should have provided funding for the community center . . . ." *Id.*

---

[3]The current version of that section provides,

The settlor, or if the settlor is deceased or not competent, the settlor's designee named or designated pursuant to section 633A.5106, the trustee, the attorney general, and any charitable entity or other person with a special interest in the trust shall be interested persons in a proceeding involving a charitable trust.

Iowa Code § 633A.5104.

We held that the community group did not have standing to press most of their claims. *Id.* at 36. Our original *cy pres* statute made "[t]he settlor, the trustee, the attorney general, and any charitable entity or other person with a special interest in the trust" interested persons for purposes of bringing an action. *Id.* (emphasis omitted) (quoting Iowa Code § 633.5104 (2001)). We noted that the statute's inclusion of the settlor among those who are an interested person was "the only obvious change made in the common law." *Id.* at 37. We then held that community members and the public did not have a sufficient interest for standing regarding the administration of the trust. *Id.* at 38–39. Similarly, "[t]he mere fact that a person is a *possible* beneficiary is not sufficient to entitle him to maintain a suit for the enforcement of a charitable trust." *Id.* at 37 (alteration in original) (quoting Restatement (Second) of Trs. § 391 cmt. *c*, at 279 (A.L.I. 1959)). We ultimately held that only the trust's decision to provide funds for construction of a specific center created a sufficient legal interest, and therefore the community group could only bring an action related to the trustees' decision to withhold those funds. *Id.* at 38–39.

Iowa Code section 540A.106(3) expressly authorizes participation in the modification proceeding by "the donor or the donor's designee having the right to enforce the restrictions under subsection 5," *in addition to* the institution and the attorney general.[4] But we do not have either a donor or a donor's designee available here. Dr. Totton, of course, passed away almost three decades ago, and he did not designate anyone under Iowa Code section 540A.106(5). The latter is

---

[4]This is actually a departure from the version of the act promulgated by the National Conference of Commissioners on Uniform State Laws. *See* UPMIFA Final Act § 6. That version does not require notification of donors or their designees. *Id.* The official comment explains that "[t]he trust law rules of equitable deviation and cy pres do not require donor notification and instead depend on the court and the attorney general to protect donor intent and the public's interest in charitable assets." *Id.* cmt. The comment adds, "Good practice will be to notify donors whenever possible." *Id.*

not surprising, since Dr. Totton died approximately a decade before section 540A.106 was enacted.

At the same time, Iowa Code section 540A.106(7) provides that the section "does not limit the application of the judicial power of cy pres." And as noted, under *cy pres*, a party with a special interest in the enforcement of a charitable trust has standing to appear. *See id.* § 633A.5104; *Mitchellville Cmty. Ctr., Inc.*, 679 N.W.2d at 38–39.

A recent New Hampshire case declined to extend *cy pres* rules of standing to a case under its version of UPMIFA. *See In re Robert T. Keeler Maint. Fund for the Hanover Country Club at Dartmouth Coll.*, 306 A.3d 795 (N.H. 2023). In 2002, an individual left a gift to a college "for the sole purpose of upgrading and maintaining its golf course." *Id.* at 797. The bequest also provided that any funds in excess of what was "necessary to sufficiently upgrade and adequately maintain the golf course" were to be distributed to a specified, separate foundation. *Id.* In July 2020, the college decided to permanently close the golf course, and applied to the courts under that state's UPMIFA for a modification of the restriction on the gift, seeking to redirect the money towards supporting the varsity golf programs. *Id.* at 798. At that point, the estate was reopened and a fiduciary was appointed. *Id.* The fiduciary and the separate foundation moved to intervene, arguing that the remaining funds from the golf bequest "should be directed to the foundation at the behest of the Estate." *Id.* The district court denied their motion to intervene but afforded them leave to file a brief as an amicus curiae with respect to the proposed modification. *Id.* The trial court granted the college's application to modify, and the putative intervenors appealed. *Id.*

New Hampshire law—like Iowa's—allows standing to parties with a special interest in the enforcement of a charitable trust. *Id.* at 799–800. Yet the court

declined to extend the doctrine to an action under its version of UPMIFA. *Id.* Absent a statutory grant of a right to intervene, the court held that the estate and the other foundation could not intervene. *Id.* at 800, 802. Nonetheless, it is noteworthy that the district court in the New Hampshire case allowed the fiduciary and the foundation to appear as amici curiae. *Id.* at 798.

We have only addressed in passing the possible participation of amici curiae in district court. *See LS Power Midcontinent, LLC v. State*, 21 N.W.3d 551, 566 (Iowa 2025) ("The rules of civil procedure do not address amicus briefing in district court. Regardless of whether a district court in its discretion might elect to allow briefing by an amicus . . . ."); *In re C.Z.*, 956 N.W.2d 113, 121 (Iowa 2021) ("[T]here is no regularized amicus practice at the trial court level.").

On remand, the district court should allow the appearance of an advocate "to protect donor intent," UPMIFA Final Act § 6 cmt., and should also consider whether other parties who seek to intervene might have standing to do so.

2. *Evidence to be considered.* The University questions the role of extrinsic evidence in this case. It notes that section 540A.106 only authorizes the court to "modify . . . the restriction on the use of the fund in a manner consistent with the charitable purposes *expressed in the gift instrument.*" (Emphasis added.) Thus, it implies, only the single paragraph describing Dr. Totton's bequest to the University is relevant.

We disagree. In the first place, the gift instrument would include the entirety of Dr. Totton's will, such as the other bequests it contains.

Second, we recently determined that extrinsic evidence was relevant in interpreting the restrictions on a charitable gift of paintings to a college. *In re Coe Coll.*, 935 N.W.2d at 590. We quoted and approved language from the Restatement (Third) of Property as follows:

> "The controlling consideration in determining the meaning of a donative document is the donor's intention. The donor's intention is given effect to the maximum extent allowed by law." Restatement (Third) of Prop.: Wills & Other Donative Transfers § 10.1, at 276 (Am. Law Inst. 2003). The Restatement adds, "In seeking to determine the donor's intention, all relevant evidence, whether direct or circumstantial, may be considered, including the text of the donative document and relevant extrinsic evidence." *Id.* § 10.2, at 278. "The text of a donative document must be read in its entirety." *Id.* cmt. *b*, at 278.
>
> "Extrinsic evidence of the circumstances surrounding the execution of the donative document that might bear on the donor's intention, directly or circumstantially, may always be considered." *Id.* cmt. *d*, at 279–80.

*In re Coe Coll.*, 935 N.W.2d at 590. We added the following thoughts:

> Consistent with the Restatement provisions and official comments quoted above, we believe a heightened emphasis on intent is appropriate when interpreting a gift as opposed to a contract or statute. A gift is the product of *one* actor's intent, not *two* actors as with a contract or *many* actors as with a statute.

*Id.*

But if extrinsic evidence of the donor's intent is relevant in interpreting the restrictions themselves, it logically follows that it would be relevant in determining what modifications of those restrictions would be consistent with the purposes expressed in the instrument. That is how we have applied *cy pres*. For example, in *Kolb*, we weighed a considerable amount of extrinsic evidence in determining whether the settlors would have wanted the memorial fountain and garden to have continued in a different location if the original location proved impracticable or impossible. 736 N.W.2d at 559–60. And ultimately we concluded that they would have approved of the modification. *Id.* ("[W]e believe the settlors would have preferred the trust to continue under cy pres if they were alive today, so that the City can continue to display the flowers in the lakeside

park in honor of the memory of their deceased grandson."). According to the Restatement (Third) of Trusts:

> In framing a scheme for the application of property cy pres, the court will consider evidence suggesting what the wishes of the settlor probably would have been if the circumstances had been anticipated. Such an assessment may look to whatever evidence is available concerning the attitudes and interests that appear to have motivated the settlor's selection of the particular purpose. Thus, it would be especially appropriate to consult the donor if available. In other situations, the circumstances of the trust's creation may be revealing, as may the settlor's relationships, social or religious affiliations, personal background, charitable-giving history, and the like.

Restatement (Third) of Trs. § 67 cmt. *d*, at 516 (A.L.I. 2003).

3. *Permissible modifications.* Iowa Code section 540A.106(3) authorizes the district court to "modify" the restriction. But the official comment makes clear that the word "modify" is interpreted broadly: "The term 'modify' encompasses the release of a restriction as well as an alteration of a restriction and also permits a court to order that the fund be paid to another institution." UPMIFA Final Act § 6 cmt.

Likewise, under *cy pres*, if the specific purpose that cannot be fulfilled was the donor's primary purpose, then the court cannot continue the existing charitable trust while altering that primary purpose. *Cf., e.g.*, *Kolb*, 736 N.W.2d at 559–60 (determining that *cy pres* could apply because the location of the fountain and garden was not the donor's primary purpose); *see also Hodge v. Wellman*, 179 N.W. 534, 537 (Iowa 1920) (holding that a failed term of a bequest was not the primary purpose of the bequest but was instead a mode of accomplishing the purpose).

Also, *cy pres* is "inapplicable when the testator has anticipated the possible failure of the trust and has made alternative disposition of his property to meet

that contingency." *Simmons v. Parsons Coll.*, 256 N.W.2d 225, 227 (Iowa 1977). In *Simmons v. Parsons College*, for example, the testator gave the residue of his estate in equal shares to two different postsecondary institutions for scholarships for needy students. *Id.* at 226. When one of the institutions went bankrupt, we ruled that *cy pres* should not be applied because the testator had made provision that if either charitable trust failed, the funds would go to his legal heirs at law. *Id.* at 227.

So we interpret "modify" in Iowa Code § 540A.106(3) as consistent with the official comment to UPMIFA and our preexisting law of *cy pres*.

**V. Conclusion.**

For the foregoing reasons, we reverse the district court's order of dismissal without prejudice and remand for further proceedings consistent with this opinion.

**Reversed and Case Remanded.**

Christensen, C.J., and Waterman, Oxley, and McDermott, JJ., join this opinion. McDonald, J., files an opinion concurring in part and concurring in the judgment, in which May, J., joins.

**McDonald, J., (concurring in part and concurring in the judgment).**

Iowa Code section 540A.106(3) (2025) allows an institution to petition to modify the purpose of a charitable gift fund or the restriction on the use of funds if the purpose or restriction becomes unlawful or impracticable to fulfill. The district court dismissed the University of Iowa's (University) petition to modify a gift restriction on the ground that the University failed to establish that the restriction was unlawful or impracticable. The only issue properly presented in this appeal is whether the district court erred in reaching that conclusion. I concur in the court's conclusion that the district court erred and that the case should be remanded for further proceedings. I respectfully decline to join the remainder of the court's opinion offering guidance to the district court on who should be allowed to participate in this proceeding following remand and how the district court should resolve other potential issues. Those issues are not properly before the court. In addition, opining on those issues at this point in the proceeding is necessarily one-sided given that the court's advice is based on a supplemental appendix filed by amici that includes material not in the record to which the University has been unable to respond. *See* Iowa R. App. P. 6.801 (defining the record on appeal). Rather than offering advice to amici or other persons on how they could seek to intervene in this case and how the district court should resolve issues those persons might raise, I would resolve the single issue presented on appeal and remand this matter to the district court for further proceedings in the ordinary course.

May, J., joins this concurrence in part and concurrence in the judgment.